[No. A055123. First Dist., Div. Two. Oct. 28, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES LEE CARTER, Defendant and Appellant.

## Counsel

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Aileen Bunney and Joan Killeen, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

BENSON, J.—Charles Lee Carter (defendant) appeals from the judgment after he was convicted of murder and several lesser offenses and sentenced

to life imprisonment without possibility of parole. He claims the trial court erred by admitting evidence linking him with a prior similar murder, and by denying his request for immunity in connection with any testimony he might give to rebut that evidence. In addition, he claims the court gave an improper special instruction, and failed to give required instructions on lesser included offenses. We affirm.

## I.

### FACTS AND PROCEDURAL HISTORY

In 1988, Ken Ericksen lived in Pleasant Hill, California. His neighbor, Raymond Floers, had known him for 21 years. Ericksen suffered from multiple sclerosis. Among his symptoms were physical weakness and an inability to hold objects securely in his hands, especially when under stress.

On September 11, 1988, about 6 p.m., Ericksen asked Floers if Floers wanted any Chinese food. A short time later, Ericksen left. He was dressed in shorts and a tank top, and was driving his own car. About 8 p.m. that night, Robert Flynn, who also had known Ericksen for some years, saw him in his car outside an adult bookstore in Pleasant Hill. The bookstore was a place where homosexual men were accustomed to meet each other; Flynn knew that Ericksen was gay.

About 10 p.m. on the same evening, Peter Lloyd was driving away from Orinda, California, on Wildcat Canyon Road near its intersection with Camino Pablo Road. When he saw an unattended and blazing car by the side of the road, he turned around and headed back to Orinda to report it. On his way, he saw a car and three men in a turnout. The men were at the rear of the car; two were standing fully dressed, while the third was lying naked on the ground. The naked man looked at Lloyd but said nothing; the other two explained they were "pulling a prank." Lloyd left, but mentally noted the license number of the car. When he reached a phone, he reported both incidents, but when he returned to the scene of the car fire, the three men and their car were gone.

On September 13, 1988, Ericksen's naked body was discovered off Wildcat Canyon Road in the area described by Lloyd. Ericksen had been shot several times at close range with a .22-caliber weapon. One of the shots had killed him. On the following day, a school principal called police to check on a car that had been parked in the school lot for several days. The car was registered to Ericksen, and contained among other things his mortgage book, a tank top, jogging shorts, and underwear.

The license plate number given to police by Lloyd apparently led them to defendant; about 10 p.m. on September 14, they went to defendant's address, but he was not home. On the following day, police saw defendant's car and pulled him over. Defendant and his friend Robert Staedel were in the car. Defendant and Staedel were taken into custody. While defendant and Staedel were at a local police station, police discovered a wallet containing Ericksen's driver's license in the car. Ericksen's photograph had been cut out, and Staedel's driver's license placed underneath to show Staedel's picture in Ericksen's license. A second wallet contained a license in the name of Scott Fullerton, which had been similarly mutilated and arranged to show defendant's picture instead of Fullerton's.[1] Police also discovered sales receipts in Ericksen's name dated after his body was discovered, Ericksen's checkbook, his automatic teller card, a new coat, and various new auto accessories. When defendant's apartment was searched, police found another sales receipt in Ericksen's name and a Franchise Tax Board letter addressed to Ericksen. Like the other receipts, the receipt found in defendant's apartment was dated after Ericksen's body was discovered.

Numerous witnesses testified to transactions in which Ericksen's credit cards were used to purchase new goods between September 12, 1988, and September 15, 1988. On September 12, Staedel and another man used Ericksen's American Express card to buy clothing at the Pleasanton Emporium. On the same day, Ericksen's cards were used at various locations to buy electronic equipment, a silver plated tea service, more clothing, and other personal items such as sunglasses, perfume, and jewelry. Several of the witnesses identified the purchaser as either defendant or Staedel. On September 14, Ericksen's cards were used to buy more jewelry, and defendant and Staedel attempted to use Ericksen's cards to buy more electronic equipment, jewelry, and clothing, but the charges were refused. On September 15, defendant purchased a watch with Ericksen's Emporium card, and Ericksen's credit card was used to buy a jacket at the same store.

After defendant was arrested on September 15, he and Staedel were interviewed separately by police. In the initial stages of the interview with defendant, he denied any knowledge of the Ericksen killing. However, as police revealed the extent of the evidence they had gathered at that point, defendant's version evolved and expanded.

At first, defendant admitted only that he had been driving on Wildcat Canyon Road on the night in question, but when police told him they had found Ericksen's credit cards in his car, he said he and Staedel had gotten the cards from a briefcase they had found beside the road.

---

[1]Police testified they contacted Fullerton after defendant's arrest.

After being told the cards belonged to a murder victim, defendant eventually said he and Staedel had gone to the Pleasant Hill adult bookstore to make a sexual pickup. They found Ericksen there, and the three of them went to a nearby industrial area. According to defendant, Ericksen was sexually forward, which offended him and Staedel. Defendant and Staedel forced Ericksen to strip, and ordered him into the trunk of their car. They went through Ericksen's papers, and drove up to "the road," where they took Ericksen out of the trunk. Ericksen was lying on his stomach when Lloyd drove by and asked what was going on. Defendant told Lloyd it was a fraternity prank. After Lloyd left, Ericksen got up, told defendant and Staedel they would have to beat him up, and walked off into the bushes. According to defendant, he and Staedel then left.

When police told defendant that Ericksen had been shot, defendant again added to his version of events. He told police that about two weeks before, he had borrowed a Beretta .22-caliber pistol from a friend. He described the events leading up to the confrontation on Wildcat Canyon Road much as he had before, but then related a different conclusion. He told police that Ericksen picked up a large rock and advanced toward defendant and Staedel. Defendant told Staedel to look out, and returned to the car to get the gun. He loaded the gun and told Ericksen to drop the rock. Defendant told police that Ericksen said "you'll have to kill me, or I'm going to kill you," upon which defendant shot Ericksen twice, wounding him. Ericksen began screaming, and Staedel took the gun and shot Ericksen again. Defendant said Ericksen fell over a cliff. Defendant and Staedel went and looked at Ericksen, who was "just lying there," and then left.

In tape-recorded interviews that were before the jury[2] defendant elaborated on the events leading to Ericksen's death. In addition to the events we have summarized above, defendant told police that after he shot Ericksen twice, Ericksen again picked up a rock. Staedel asked for the gun, and defendant gave it to him. Staedel fired several more shots at Ericksen, hitting him several times. Ericksen fell over a cliff; he appeared to be dead. According to defendant, after Staedel and defendant checked the body, they left. However, in an interview at which both Staedel and defendant were present with police, Staedel said that Ericksen fell after he shot him, upon which he and defendant rolled Ericksen over the embankment. Defendant went part of the way to where Ericksen had fallen, but Staedel went all the way, and shot Ericksen five or six more times when he saw Ericksen was still moving. Defendant did not contradict Staedel's version of events at the interview.

---

[2]The tapes were played for the jury, and transcripts of the tapes were introduced into evidence. Our summary is taken from the transcripts.

The jury also heard tape recordings of defendant's conversations with Staedel at the police station when officers left them alone in an interview room. In those conversations, defendant and Staedel among other things discussed the offense, how they would present themselves to the jury, and compared the stories they had told the police. In the latter exchange, Staedel told defendant he had "stuck to the plan" until told that defendant was blaming "it" on him.

Other witnesses added details of defendant and Staedel's activities before and after Ericksen was killed. Scott Davis, a friend of both defendant and Staedel, testified that on September 12, 1988, he learned that defendant and Staedel were using someone else's credit cards. When he asked what they would do when the owner cancelled the cards, defendant and Staedel laughed, and Staedel told him the owner would not cancel. Staedel and defendant proposed that all three of them go to Lake Tahoe, but after Davis learned that defendant intended to use Ericksen's stolen credit card, he decided not to go. On September 15, when Davis told them they would get caught if they used the credit cards, defendant told Davis they would not get caught because they were "going to move the body."

Debbie Kiefer also knew defendant and Staedel. She was with them on August 25, 1988, and heard defendant tell Staedel that they were going to get a gun that night. In early September, Kiefer saw a gun under the seat of defendant's car. After Staedel was arrested in connection with the Ericksen killing, Staedel told Kiefer that he had shot Ericksen because he did not want to be identified.

David Shepard, who also knew defendant and Staedel, testified they came to his apartment on August 28, 1988, and asked if Shepard knew where they could get a gun. Shepard gave defendant a .22-caliber Beretta; defendant told Shepard he would return the gun the next day, but did not return it for three weeks. A ballistics expert identified the Beretta as the gun that fired both the bullets taken from Ericksen's body, and the bullets and casings found near the body.

Following defendant's arrest and confession to police, he and Staedel were jointly charged with murder committed under special circumstances supporting imposition of the death penalty. (Pen. Code, §§ 187, 190.1.)[3] The following special circumstances were charged: kidnap-murder, robbery-murder, murder during the course of a kidnapping committed for purposes of robbery, and murder during the course of robbery, kidnapping, and kidnapping for purposes of robbery. (§ 190.2, subds. (a) and (b).) The information

---

[3]All further statutory references are to the Penal Code unless otherwise specified.

also charged kidnapping for purposes of robbery, kidnapping, and robbery. In connection with each of the counts, the information made enhancing allegations based on personal use of a firearm and infliction of great bodily injury. Before trial, defendant's motion to sever was granted. Trial began in Contra Costa County on September 4, 1990. The jury convicted defendant of robbery and simple kidnapping, but were unable to reach a verdict on the counts charging murder and kidnapping for purposes of robbery, nor as to the special circumstance or enhancing allegations.[4]

On defendant's motion, venue for retrial on the mistried counts was changed to Sacramento County. Retrial on the murder and kidnap for purposes of robbery counts began in Sacramento County on May 28, 1991, before the same trial judge that had presided over the first trial. The second jury found defendant guilty of first degree murder with special circumstances, guilty of kidnapping for purposes of robbery, and found true the allegations that defendant had personally used a firearm and had caused great bodily injury.[5] The jury fixed the penalty on the murder count at life without possibility of parole. The case was then retransferred to Contra Costa County for imposition of sentence. On September 13, 1991, defendant was sentenced to life imprisonment without possibility of parole with a two-year enhancement on the principal charge, and to stayed terms on the remaining subordinate counts and enhancing allegations. The conviction of simple kidnapping was dismissed. This appeal followed.

## II.

### DISCUSSION

Defendant raises four distinct claims of error. We treat each in turn.

### A. *Other Crimes Evidence*

Over objection, the court admitted evidence tending to prove that defendant had killed Luis Baro shortly before the Ericksen killing. The evidence in question was as follows. Luis Baro lived alone in Hayward, California. He was a homosexual. On the evening of August 31, 1988, about two weeks before the Ericksen killing, Baro had arranged to meet Charles Waits at a Hayward bar. Waits, a longtime friend of Baro, saw Baro and defendant together at the bar after he arrived. Waits had planned to go with Baro to a

---

[4]Defendant does not claim any error occurred in the first trial that was not repeated in the second. Accordingly, our summary of the proceedings at the first trial is limited to the areas necessary to an understanding of the issues arising out of the conduct of the second.

[5]Defendant waived jury trial on the enhancing allegations as to the two counts resolved by the first trial. Sitting as the trier of fact, the court found those allegations true.

party, but changed his plans when Baro told him he wanted to bring defendant along. When Waits left the bar about 8:30 p.m., Baro and defendant were still talking at the bar. Waits never saw Baro alive again, and learned later from newspaper accounts that Baro had been murdered.

Baro had planned to visit his mother on September 1, 1988. He did not come, and his mother began calling him at 7 a.m. on September 2. She knew Baro had an answering machine, but it did not pick up her calls, and she was never able to reach him. On September 7, she and her husband went to Baro's apartment. The apartment had been ransacked. They found Baro's body facedown on the bed in the bedroom. Baro had been bound hand and foot and shot at point-blank range in the back of the head. In the opinion of the medical examiner who performed the autopsy, the state of the body was consistent with the theory that Baro had been shot to death on August 31. The bullet that killed Baro had fragmented on impact, but a shell casing and unfired bullet were found near his body. Both had been fired from the same gun that killed Ericksen.

Police obtained Baro's telephone billing records, which showed two short calls from Baro's telephone to Robert Staedel's private number at his parent's house. The calls were made between 9:16 p.m. and 9:32 p.m. on August 31. Several witnesses from Staedel's family testified he was at home on the evening of August 31.

Baro's car was discovered in a Hayward parking lot after a parking lot employee called police on September 9, 1988. The car had been in the lot unattended since September 1, 1988. The car was unlocked and looked as though it had been ransacked. Defendant's fingerprint was found on the window of the car. When defendant's apartment was searched, police discovered an answering machine which contained a tape of Baro's voice, several pieces of Baro's jewelry, and credit and check guarantee cards in Baro's name. A bank employee testified that September 1, 1988, defendant told her he had attempted to make an automatic teller withdrawal but that the machine had taken his card. He spoke on the telephone with an employee at another branch, and identified himself as Luis Baro. Luis Baro's card was later discovered in the machine. An employee at the other branch testified she knew Baro personally, and received several calls on September 1 from a person who falsely identified himself as Baro. Finally, a J.C. Penney's store clerk testified that two young men used Baro's card to buy merchandise on September 1, 1988.

Defendant argues the trial court erred by admitting the evidence of the Baro killing. We disagree.

The admissibility of evidence of uncharged offenses "depends upon three principal factors: (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence. [Citations]." (*People* v. *Thompson* (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883].) To be material, the evidence need only tend to prove or disprove some fact in issue. There is no question defendant's intent to kill Ericksen was a material issue; in view of his unrebutted statements to police admitting involvement in the killing, intent was effectively the only real issue for the jury in the guilt phase of the trial. (See *People* v. *Robbins* (1988) 45 Cal.3d 867, 879 [248 Cal.Rptr. 172, 755 P.2d 355] [uncharged misconduct evidence is material where proof of intent is ambiguous].)

Accordingly, defendant's attack on the ruling focuses on the second prong of the test stated in *Thompson*. He argues that the similarity between the two killings was not great enough to warrant admission. A court considering this question " 'must look behind the label describing the kind of similarity or relation between the [uncharged] offense and the charged offense; it must examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong.' " (*People* v. *Thompson*, *supra*, 27 Cal.3d at p. 316, quoting *People* v. *Schader* (1969) 71 Cal.2d 761, 775 [80 Cal.Rptr. 1, 457 P.2d 841].) Where the issue in question is intent, the similarity between the charged and uncharged offenses must be substantial, but need not reach the same "quantum of 'similarity' as when uncharged conduct is used to prove identity." (*People* v. *Robbins*, *supra*, 45 Cal.3d at p. 880; and see *People* v. *Nible* (1988) 200 Cal.App.3d 838, 848-850 [246 Cal.Rptr. 119].)

We find the similarity between the killings of Baro and Ericksen substantial enough to support admission of the uncharged offense evidence. Both victims were homosexual men of about the same age. Both met defendant in public places, and then went with him to more secluded locations where they were robbed and killed. The killings were close to-gether in time, and both victims were dispatched with shots to the head at close range by the same gun. In both cases, the victim's cars were ransacked and left in public areas. Both victims were robbed of their credit cards, and other valuables. In both cases, defendant immediately used the cards in variously successful attempts to obtain merchandise, services, and cash. In both cases, the victim was rendered relatively helpless; Baro by bindings, and Ericksen by stripping him of his clothes. We are satisfied that the Baro killing was sufficiently similar to the Ericksen killing to establish a strong

inference that defendant intended from the first to use the gun to rob and kill Ericksen, and rebutted the claim that defendant did not intend the killing, but acted only in self-defense.

We reject defendant's claims the dissimilarities between the two killings required exclusion of the evidence. Defendant points out that the killings occurred in different counties, that Ericksen was Caucasian while Baro was Filipino, that Baro was killed in his home, while Ericksen was taken to a secluded but public place, and finally, that Ericksen was shot numerous times, but Baro was shot only once. We agree that the killings were not identical. However, the points of similarity occur precisely in those areas which are most relevant to the issue on which the evidence was offered. The key issue at trial was whether Ericksen was killed impulsively when he threatened defendant, or whether the killing was a part of a scheme to abduct, rob and kill. Defendant's link to the Baro murder and the similarities between the two killings provided a strong inference that both were accomplished with the same intent. That clear connection between the uncharged offense and ultimate fact in dispute supported admission. (*People* v. *Thompson, supra*, 27 Cal.3d at p. 316; see, e.g., *People* v. *Gallego* (1990) 52 Cal.3d 115, 172 [276 Cal.Rptr. 679, 802 P.2d 169] [sufficient similarity where victims were lured, kidnapped, taken to different rural locations, sexually assaulted, and murdered].)

We also reject defendant's contention the evidence of the Baro killing should have been excluded because any probative value it had was outweighed by its prejudicial effect. The link between defendant and the Baro killing tended to directly rebut his claim he shot Ericksen in defense of Staedel, and had not intended to shoot Ericksen until that moment. Given the importance of that issue in the case, "[t]he court could properly conclude that the potential for prejudice was outweighed by the probative value of the evidence on this crucial point." (*People* v. *Robbins, supra*, 45 Cal.3d at p. 881.)

B. *Immunity*

Defendant next claims the trial court erred by refusing to grant him immunity against the use of his testimony to the circumstances surrounding the Baro killing. In the offer of proof made in support of the motion for immunity, defendant submitted that in addition to testimony to the circumstances of the Ericksen killing, he would have testified that he was present when Baro was killed, and that he took Baro's personal property. Defendant argued to the trial court, as he does here, that unless he was granted use

immunity, he could not testify without risking self-incrimination in connection with the Baro killing.[6] He urges we must reverse because the court's denial of the motion deprived him of the due process right to be heard in his own defense and infringed on his Fifth Amendment right to remain silent.

The contention raises an interesting question on which there apparently is no direct authority.[7] Defendant relies principally on *People v. Coleman* (1975) 13 Cal.3d 867 [120 Cal.Rptr. 384, 533 P.2d 1024]. In *Coleman*, the defendant, a probationer, was charged with theft. (*Id.* at p. 872.) A revocation hearing was set, with trial on the theft charge to follow. At the revocation hearing, the defendant moved to continue until after the theft trial was completed. The motion was denied and defendant "consequently elected not to testify at the hearing." (*Id.* at p. 873.) Probation was revoked and the defendant appealed. On review, our Supreme Court declared "as a judicial rule of evidence" that the testimony of a probationer at a revocation hearing is inadmissible at a subsequent trial on charges based on the same conduct that prompted revocation. (*Id.* at p. 889.) *Coleman* is based on the premise that it is unfair to allow the state to force a probationer to choose between the "unpalatable alternatives" of losing the opportunity to present a meritorious defense in the revocation proceedings, risking the use of his statements in a subsequent trial, or committing perjury. (*Id.* at p. 878.)

Though *Coleman* expressed its holding in terms of a judicially devised exclusionary rule, later cases have treated *Coleman* as creating a limited species of use immunity grounded in California's constitutional guarantee against self-incrimination. (See *Ramona R. v. Superior Court* (1985) 37 Cal.3d 802, 808-809 [210 Cal.Rptr. 204, 693 P.2d 789].) As explained in *Ramona R.*, the immunity announced in *Coleman* is based on the same policies that underlie the privilege against self-incrimination; first, the policy which requires the state to carry its burden of proving guilt without the defendant's compelled personal assistance, and second, the policy against subjecting a defendant to the " 'cruel trilemma of self-accusation, perjury, or contempt.' " (*Ramona R. v. Superior Court, supra,* 37 Cal.3d at pp. 809-810.)

---

[6]We are informed that although defendant has been criminally charged with that killing, no trial date has yet been set.

[7]Respondent's claim the issue was waived by defendant's failure to renew the motion at the second trial is not supported by the record. Before the second trial began, the prosecutor again moved for admission of the uncharged misconduct evidence. During argument on the motion, the parties stipulated that all argument raised at the first trial would be before the court in its consideration of the question. On defense counsel's specific request, the court and parties agreed that defendant's written opposition to the motion as made in the first trial would be included in the stipulation. Because that opposition contained the request for immunity, we find the issue was before the court in the second trial, and was preserved for review. (See *People v. Morris* (1991) 53 Cal.3d 152, 190 [279 Cal.Rptr. 720, 807 P.2d 949] [motion *in limine* sufficient to preserve evidentiary issue for appeal].)

In addition, *Ramona R.* noted the serious potential consequence of a failure to testify in juvenile fitness proceedings, and offered that as an additional factor supporting immunity. (*Id.* at pp. 810-811.)

The immunity devised in *Coleman* has been extended to other situations analogous to the probation revocation proceeding faced by the defendant in *Coleman.* (*Ramona R.* v. *Superior Court, supra,* at p. 810 [testimony of minor at fitness hearing or statements to probation officer]; *In re Jessica B.* (1989) 207 Cal.App.3d 504, 520 [254 Cal.Rptr. 883] [statements of parent in child dependency proceedings]; *People* v. *Dennis* (1986) 177 Cal.App.3d 863, 876 [223 Cal.Rptr. 236] [statements of defendant in support of motion for new trial on grounds of ineffectiveness of trial counsel]; and see *Simmons* v. *United States* (1968) 390 U.S. 377, 394 [19 L.Ed.2d 1247, 1259, 88 S.Ct. 967] [statements of defendant at pretrial motion to suppress evidence].) However, courts have found *Coleman* inapplicable where the analogy to pretrial probation proceedings was not present. (See *People* v. *Harris* (1992) 8 Cal.App.4th 104, 108 [10 Cal.Rptr.2d 42] [testimony of defendant in first phase of bifurcated trial]; *People* v. *Baumann* (1985) 176 Cal.App.3d 67, 84 [222 Cal.Rptr. 32] [testimony at posttrial restitution hearing]; *People* v. *O'Connell* (1984) 152 Cal.App.3d 548, 554 [199 Cal.Rptr. 542] [defendant's prior trial testimony used in subsequent proceeding against him].)

Here, defendant argues we should extend *Coleman* immunity to protect a defendant in an ongoing trial in which he takes the stand to rebut admissible other crimes evidence, and there is a possibility his testimony may be used against him in a subsequent prosecution. Defendant cites no authority for the proposition. We find the considerations that led *Coleman* and its progeny to apply a rule of immunity do not exist here. Accordingly, we conclude the trial court did not err by refusing to grant immunity.

The principal concern addressed in *Coleman* was the "danger of abuse by the state of its opportunity to coerce self-incriminatory testimony by scheduling the probation revocation hearing in advance of trial." (*People* v. *Coleman, supra,* 13 Cal.3d at pp. 888-889.) Such abuse directly affects an important policy underlying the privilege against self-incrimination, i.e., the requirement that the state prove guilt without the compelled assistance of the accused. (See *Ramona R.* v. *Superior Court, supra,* 37 Cal.3d at p. 809.) However, the introduction of other crimes evidence does not provide the same opportunity for abuse, nor does it raise the same concerns. For example, in the present case, it is unlikely that the prosecution's decision to proffer evidence of the Baro killing was made even in part on the expectation that defendant would be compelled to take the stand to explain it. Indeed, given that the purpose of other crimes evidence is limited and the

restrictions on its use extensive, it is unlikely that state would have the opportunity for the kind of abuse treated in *Coleman*.

Second, as *Coleman* points out, the need for judicially fashioned immunity is reduced where the concurrent proceeding offers a "high degree of procedural protection against arbitrariness," and the defendant's choice is "generally one of strategy rather than desperation." (37 Cal.3d at p. 886.) Unlike a probation revocation proceeding, fitness hearing, or child dependency proceeding, a criminal trial is replete with procedural protections, principally the requirement that the state prove its case to a jury and establish guilt beyond a reasonable doubt. That protection removes the incentive to testify that was present in such cases as *Coleman* and *Ramona R.*, in which the defendants faced serious potential consequences if they chose not to explain their actions to the trial judge.

Moreover, the decision whether to rebut other crimes evidence where such evidence may be the subject of a later trial is essentially strategic. The principal difficulty the defendant faces in the cases in which courts have found immunity appropriate is the tension between conflicting objectives, which is exacerbated by the lack of procedural protection in the prior proceedings. (*People* v. *Coleman, supra*, 13 Cal.3d at p. 886.) For example, a probationer facing revocation may determine his best course is to admit misconduct to the court, but emphasize mitigating factors. In a subsequent criminal trial, however, his best course may be to flatly deny responsibility and trust in the higher standard of proof required both by law and as a practical matter by the presence of a jury. *Coleman*'s holding is in large part based on its recognition of that tension. (*Ibid.*) A defendant contemplating whether to rebut other crimes evidence is in a different position. In most circumstances, the choice is one of timing rather than strategy, because the defense to other crimes evidence is unlikely to vary from one proceeding to the next. If the defendant intends to take the stand to deny any connection with the other me, that intention would not be different in a trial in which the other crime was charged. Similarly, if the defendant intends to admit all or part of the uncharged misconduct, and submit mitigating or excusing evidence, there is no difference in the posture of the two proceedings which would impel a change in that strategy from one to the next. Thus, the decision to testify in the first trial rather than the second, or in the second but not the first, is a choice having more to do with a calculation of the likely effect of the testimony than with a dilemma posed by differing defense objectives at the two proceedings, and on that basis is distinguishable from the situations in which courts have granted immunity.

We conclude that the immunity devised in *Coleman* and its progeny should *not* be extended to protect a defendant who wishes to testify in

rebuttal to other crimes evidence which may become the basis of a subsequent prosecution. The dilemma such a defendant faces, though real, is not of such an order as to require immunity.

## C. *Robbery Instructions*

 Defendant next argues the trial court erred when answering a jury question about the duration of robbery. The court instructed the jury that a robbery continues until the robber has reached a place of temporary safety, and that the robber has not reached such a place so long as continued control over the victim places the robber's safety in jeopardy. Defendant contends the instruction was argumentative and created a conclusive presumption in favor of the prosecution on the question whether defendant murdered Ericksen "in the perpetration of" a robbery, i.e, whether the murder was a felony murder. (Pen. Code, § 189.) We find the instruction was a correct statement of the law, and did not have the vices attributed to it by defendant.

 We first briefly review the law defining the duration of a robbery. As the court instructed, it is established that a robbery continues until the perpetrator has reached a place of temporary safety. (See, e.g., *People* v. *Fierro* (1991) 1 Cal.4th 173, 226 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) Whether in a given case the robber has reached a place of safety is ordinarily a question of fact; a jury's implied finding on the issue will be upheld so long as supported by substantial evidence. (*People* v. *Stankewitz* (1990) 51 Cal.3d 72, 101 [270 Cal.Rptr. 817, 793 P.2d 23]; *People* v. *Fields* (1983) 35 Cal.3d 329, 367 [197 Cal.Rptr. 803, 673 P.2d 680]; and see *People* v. *Young* (1992) 11 Cal.App.4th 1299, 1306-1307 [15 Cal.Rptr.2d 30].) In cases involving a kidnapping and robbery, courts have held almost without exception that the evidence supported the conclusion the robber had not reached a place of temporary safety so long as the victim remained under the robber's control. (See *People* v. *Fields*, *supra*, at pp. 365-368 [analyzing cases]; cf. *People* v. *Ford* (1966) 65 Cal.2d 41, 55-56 [52 Cal.Rptr. 228, 416 P.2d 132] [robbery terminated as a matter of law even though victim still captive].)

 Here, the initial jury instructions included an instruction based on CALJIC No. 9.44 (5th ed. 1988).[8] The instruction informed the jury that a robbery continues while the robbers are fleeing, and is not complete until

---

[8]Unless otherwise specified, all further references to CALJIC instructions are to the 5th edition.

they reach a place of temporary safety.[9] After the jury had retired for deliberation, it sent a note to the court requesting more instruction on the duration of a robbery.[10] At the prosecutor's request, the court then instructed the jury that it should consider all the evidence, including the evidence of the perpetrator's control over the victim, and reminded the jury to consider its earlier instruction on the duration of robbery. The court then went on to give the instruction on which defendant bases his claim of error. The court instructed the jury that "[a] perpetrator of a robbery has not reached a place of temporary safety if the continued control over the victim places the perpetrator's safety in jeopardy." Defendant argues this last instruction was an improper pinpoint instruction that had the additional vice of giving rise to a presumption that a robbery continues so long as the robbery victim is held captive by the perpetrator, no matter what other circumstances obtain. We disagree.

The instruction is a correct statement of the law. A robber who has kidnapped his victim is "continuously in jeopardy" during the period of captivity because at any "unguarded moment" the victim might manage to escape or signal for help. (*People* v. *Stankewitz, supra,* 51 Cal.3d at p. 101.) Defendant recognizes the instruction is accurate, but argues it is argumentative and coercive. Not so.

First, the instruction was not argumentative. In *People* v. *Wright* (1988) 45 Cal.3d 1126 [248 Cal.Rptr. 600, 755 P.2d 1049], the court condemned special instructions that "would invite the jury to draw inferences favorable to the defendant from specified items of evidence on a disputed question of fact" because such instructions are argumentative and therefore belong in the argument of counsel and not in the charge to the jury. (*Id.* at p. 1135.) (7) In contrast, it is proper to give a special instruction on a matter critical to the defense, or in other words, an instruction which "pinpoints" the theory of the defendant's case. (*Id.* at p. 1137.) Such an instruction

[9]The full instruction as given by the trial court was as follows: "The commission of the crime of robbery is not confined to a fixed place or a limited period of time. . . . [¶] A robbery is still in progress after the original taking of physical possession of the stolen property while the perpetrator is in possession of the stolen property and fleeing in an attempt to escape. Likewise, a robbery is still in progress so long as immediate pursuers are attempting to capture the perpetrator or to regain the stolen property. [¶] A robbery is complete when the perpetrator has eluded any pursuers, has reached a place of temporary safety, and is in unchallenged possession of the stolen property after having effected [an] escape with such property."

[10]The note from the jury requested "clarification of when robbery stops. When someone got home or when someone were [*sic*] caught. . . . If you rob someone at 7:00 p.m.; then something happens and this person dies at 11:00 p.m.; and this person was not out of their company by force, is this still first degree?"

should "focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt . . . by listing, in a neutral manner, the relevant factors supported by the evidence." (*Id.* at p. 1141.) However, the instruction should not take a position as to the impact of the factors, nor should it imply that any particular conclusions be drawn from specific items of evidence. (*Id.* at pp. 1137, 1141.) ■ Here, the instruction given informed the jury that it should consider whether the robber's continued control over the victim placed the robber in continued jeopardy. There was no reference to specific evidence, and the instruction was phrased to emphasize the jury's duty to determine as a matter of fact whether the control affected the robber's safety. (Cf. *People* v. *Farmer* (1989) 47 Cal.3d 888, 913-914 [254 Cal.Rptr. 508, 765 P.2d 940] [disapproving instructions which would have related reasonable doubt instructions to specific and contested evidentiary facts].) Contrary to defendant's assertion, there is no part of the instruction which implies that defendant's continued control *should* be a basis for the finding he had not reached a place of temporary safety. We conclude the instruction is not argumentative.[11]

■ For the same reasons, we are not persuaded by defendant's claim the instruction required the jury to presume no place of temporary safety had been reached so long as Ericksen was a captive. (See, e.g., *People* v. *Frye* (1992) 7 Cal.App.4th 1148, 1160 [10 Cal.Rptr.2d 217]; *Sandstrom* v. *Montana* (1979) 442 U.S. 510, 523 [61 L.Ed.2d 39, 50, 99 S.Ct. 2450].) The instruction explicitly directed the jury to find that a place of temporary safety had not been reached *if* Ericksen's captivity posed a continued threat to defendant's safety. In short, it instructed the jury to reach a legal conclusion based on its assessment of the facts. It did not direct the jury to presume a fact in issue, nor did it shift the burden of proof to defendant. Accordingly, we reject the challenge to the instruction, and do not reach defendant's arguments intended to demonstrate prejudice.

## D. *Lesser Offense Instructions*

■ Defendant finally argues the court erred by refusing to give lesser included offense instructions on kidnapping and robbery. The original information charged four basic offenses; murder under special circumstances, kidnap for purposes of robbery, robbery and kidnapping. At the conclusion of the first trial, the jury found defendant guilty of kidnapping and robbery,

---

[11]We reject without extended discussion the suggestion a prosecutor may not request proper pinpoint instructions. So long as the instruction is otherwise proper, no right of the defendant is infringed by allowing the prosecutor to request an instruction which focuses a jury on factors which are relevant to its determination of the issues for decision.

but hung as to the more serious murder and kidnapping for robbery counts. At the conclusion of the second trial, defendant requested that in addition to instructions on the two offenses tried, the jury should be instructed on the lesser included offenses of which he had already been convicted. It is clear, and respondent concedes, that absent the prior convictions, defendant would have been entitled to the instructions. (See, e.g., *People* v. *Geiger* (1984) 35 Cal.3d 510, 531 [199 Cal.Rptr. 45, 674 P.2d 1303].) Thus, the issue is whether conviction of the lesser offenses at defendant's first trial precluded included offense instructions at the second on the identical charges. Neither party has cited us any direct authority on the point, and we have found none. However, we conclude that on general principles applicable to included offense instructions, the trial court correctly refused to instruct on robbery and kidnapping. A defendant may not have the jury instructed on lesser included offenses of which he cannot be legally convicted. (*People* v. *Diedrich* (1982) 31 Cal.3d 263, 283-284 [182 Cal.Rptr. 354, 643 P.2d 971] [no instruction on offenses barred by statute of limitations].) Because defendant had already been found guilty of robbery and kidnapping, a second set of verdicts to that effect would have been purposeless; only one conviction of each offense could follow. Thus, as in the case of a conviction had on an offense as to which the statute of limitations had run, the jury's convictions would be a legal nullity. Therefore, we find defendant was not entitled to the instructions.[12]

We reject the claim that defendant's attempt to waive his right against double jeopardy prevents the conclusion we have reached. Defendant argues that because the court in *People* v. *Diedrich, supra,* relied on authority finding no "jurisdiction" to convict of an offense barred by the statute of limitations, a defendant is entitled to otherwise proper lesser offenses instructions so long as the court has jurisdiction to convict. (*Chaifetz* v. *United States* (D.C. Cir. 1960) 288 F.2d 133, 136 [109 App.D.C. 349].) Defendant reasons that his offer to waive jeopardy therefore distinguishes cases involving lesser offenses barred by the statute of limitations. We are not persuaded. The attempt at waiver had no effect on the preexisting convictions; it remained the case that defendant could not be twice convicted of the same offense based on the same conduct. (Cf. *People* v. *Pearson* (1986) 42 Cal.3d 351, 355 [228 Cal.Rptr. 509, 721 P.2d 595].) As we have discussed, defendant was not entitled to instructions on offenses of which he could not be legally convicted.

---

[12]The prosecutor suggested that the jury be instructed that defendant had already been convicted of kidnapping and robbery. Defendant opposed the request, and the court refused it.

## III.

### DISPOSITION

The judgment is affirmed.

Smith, Acting P. J., and Phelan, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 24, 1994.