Filed 11/19/25  P. v. Carter CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CHARLES LEE CARTER,<br><br>        Defendant and Appellant. | A170792<br><br>(Contra Costa County<br>Super. Ct. No. 05008902835) |

In 1991, a jury found then 22-year-old Charles Lee Carter guilty of first degree murder with special circumstances, guilty of kidnapping for purposes of robbery, and found true the allegations he had personally used a firearm and had caused great bodily injury in connection with the 1988 murder of Kenneth Erickson.[1]  Carter now appeals from the denial of his petition for resentencing under Penal Code[2] section 1172.6.  He contends the trial court impermissibly relied on the jury's felony-murder special circumstances findings to foreclose resentencing relief as a matter of law; and that in any event the court's independent factual finding that beyond a reasonable doubt

---

[1] The record on appeal refers to the victim's last name as both "Erickson" and "Ericksen."  For consistency with the appellate briefs, we refer to the victim as "Erickson."

[2] All further statutory references are to the Penal Code.

1

Carter intended to kill Erickson as part of a plan to kidnap and rob the victim was not supported by substantial evidence. We affirm.

## BACKGROUND

### I.

### *Procedural Background*

Carter was charged, along with codefendant Robert John Staedel, with murder (§ 187, subd. (a)), kidnapping for robbery (§ 209, subd. (b)), kidnapping (§ 207, subd. (a)) and robbery (§§ 211–212.5, subd. (b)), as well as with allegations that the murder was committed while the two codefendants were engaged in the commission of a robbery, kidnapping, and kidnapping for robbery (§ 190.2, subd. (a)(17)), and that Carter and Staedel personally used a firearm (§ 12022.5, subd. (a)) and caused great bodily injury (§ 12022.7) in committing the murder.

Carter and Staedel were tried separately. (*People v. Carter* (1993) 19 Cal.App.4th 1236, 1244 (*Carter I*).) A Contra Costa jury convicted Carter of robbery and simple kidnapping, but was unable to reach a verdict on the murder and kidnapping for robbery charges, and on the special circumstances allegations. On Carter's motion for change of venue, the trial on the mistried counts was moved to Sacramento County. The second jury found Carter guilty of first degree murder with special circumstances and kidnapping for purposes of robbery, and found true the allegations that Carter personally used a firearm and had caused great bodily injury. Carter was sentenced to life without the possibility of parole. In a published decision, a different panel of this division affirmed the judgment. (*Carter I, supra,* 19 Cal.App.4th at p. 1241.)

In 2021, Carter filed a petition for resentencing pursuant to former section 1170.95, since renumbered as section 1172.6. The superior court

2

appointed counsel and subsequently issued an order to show cause. An evidentiary hearing was held on March 29, 2024, at which the parties relied on the record of the trial proceedings without presenting new evidence. On April 11, 2024, the court filed its 13-page detailed decision denying the petition. This timely appeal followed.

## II.

### *Factual Background*

#### A.  Erickson's Murder

Kenneth Erickson was a gay man with multiple sclerosis who lived in Pleasant Hill. His medical condition affected his ability to walk and hold objects securely in his hands. Erickson's physical symptoms worsened when he was under stress.

Around 6:30 p.m. on September 11, 1988,[3] Erickson drove to an adult bookstore in Pleasant Hill known for being a meeting place for gay men. A friend of Erickson's recalled seeing him in the parking lot of the bookstore around 7:45 p.m.

At about 10:00 p.m. on the same evening, Peter Lloyd was driving on Wildcat Canyon Road when he saw a burning car on the side of the road. On his way to report the fire, Lloyd saw three men at the rear of a car. Two of the men were standing fully dressed, while the third was lying naked on the ground. The naked man (later determined to be Erickson) looked at Lloyd, but said nothing; one of the other two explained they were "playing a prank." Before he left the scene, Lloyd made a mental note of the car's license plate. Lloyd reported both incidents to the police.

---

[3] All relevant factual dates are in 1988.

3

On September 13, Erickson's naked body was found lying face down at the bottom of an embankment. Erickson had been shot several times at close range with a .22 caliber weapon. Police found several .22-caliber unused bullets and expended shells at the scene. The cause of death was later determined to be a gunshot wound to the head. The following day, Erickson's car was found in a church parking lot. The car contained financial information belonging to Erickson, a tank top, jogging shorts, and underwear.

## B.    Investigation

The license plate number Lloyd gave to police led them to Carter. On September 15, police spotted Carter's car; both Carter and Staedel were inside. Carter and Staedel were taken into custody. While Carter and Staedel were detained at the station, police discovered a wallet containing Erickson's driver's license in Carter's car. Police also discovered sales receipts in Erickson's name dated after his body was discovered and other financial information in his name. When police searched Carter's residence, they found additional receipts dated after Erickson's body was discovered.

Deborah Kiefer was with Carter and Staedel on August 25, when she heard Carter tell Staedel that they were going to get a gun that night. In early September, Kiefer saw a gun under the seat of Carter's car. After Staedel was arrested in connection with the Erickson killing, Staedel told Kiefer that he had shot Erickson because he did not want to be identified.

David Shepard, who also knew Carter and Staedel, testified they came to his apartment on August 28 and asked if Shepard knew where they could get a gun. Shepard gave Carter a .22-caliber Beretta; Carter told Shepard he would return the gun the next day, but did not return it for three weeks. A ballistics expert identified a .22-caliber Beretta as the gun that fired both the

4

bullets taken from Erickson's body, and the bullets and casings found at the scene.

## C.   Carter's Statements to Police

After Carter was arrested on September 15, he and Staedel were interviewed separately by police.  Initially, Carter denied any knowledge of the Erickson killing.  However, as police revealed the extent of the evidence they had gathered to that point, Carter's version evolved and expanded.

At first Carter admitted only to driving on Wildcat Canyon Road on the night in question, but when police told him they had found Erickson's credit cards in his car he said he and Staedel had gotten the cards from a briefcase they had found beside the road.  After being told the cards belonged to a murder victim, Carter eventually said he and Staedel had gone to a Pleasant Hill adult bookstore to make a sexual pickup.  They found Erickson there and the three of them went to a nearby industrial area.  According to Carter, Erickson was sexually forward, which both Carter and Staedel found offensive.  Carter and Staedel forced Erickson to strip and ordered him into the trunk of their car.  They drove up to Wildcat Canyon Road, where they took Erickson out of the trunk and made him lay face down on the asphalt.  When a man drove by and asked what was going on, Carter explained it as a fraternity prank.  Carter said that after the man drove away, Erickson got up and grabbed a big rock, smaller than a bowling ball, with his right hand and said, " 'Fuck this shit, You'll have to beat me up.' "

When police told Carter that Erickson had been shot, Carter again added to his version of events.  He told police that about two weeks before, he had borrowed a Beretta .22-caliber pistol from a friend.  Carter continued to describe the events leading up to the confrontation on Wildcat Canyon Road much as he had before, but then gave a different conclusion.  He told police

that Erickson picked up a large rock and advanced toward Carter and Staedel. Carter told Staedel to look out and returned to the car to get the gun. He loaded the gun and told Erickson to drop the rock. Carter told police that Erickson said " 'you'll have to kill me, or I'm going to kill you,' " upon which Carter shot Erickson twice, wounding him. Erickson began screaming, and Staedel took the gun and shot Erickson again. Carter said Erickson "fell over the cliff." Carter and Staedel went and looked at Erickson, who was "just lying there," and then left.

## D. Recorded Conversation Between Carter and Staedel

The jury heard tape recordings of Carter's conversations with Staedel at the police station when officers left them alone in an interview room. In those conversations, Carter and Staedel discussed the offense, how they would present themselves to the jury, and compared the stories they had told the police. Staedel told Carter he had "stuck to the plan" until he learned that Carter was blaming "it" on him.

## E. Other Crimes Evidence

Over objection, the court admitted evidence tending to prove less than two weeks before Erickson was killed, Carter killed another gay man, 48-year-old Luis Baro.[4] (*Carter I, supra*, 19 Cal.App.4th at p. 1244.) The evidence at issue was as follows: On the evening of August 31, 1988, Baro had arranged to meet a friend, Charles Waits, at a Hayward bar. Waits, a longtime friend of Baro, saw Baro and Carter together at the bar after he arrived. Waits had planned to go with Baro to a party, but changed his plans when Baro told him he wanted to bring Carter along. When Waits left the

---

[4] The evidence was admitted under Evidence Code section 1101 as relevant to Carter's intent to kill. This evidentiary ruling was affirmed on appeal. (*Carter I, supra,* 19 Cal.App.4th at pp. 1246–1247.)

bar about 8:30 p.m., Baro and Carter were still talking at the bar. Waits never saw Baro alive again and learned later from newspaper accounts that Baro had been murdered.

Telephone records from Baro's residence on August 31 showed a one-minute call was made to Staedel's private phone number at 9:16 p.m. and again at 9:32 p.m. According to his family, Staedel was home on the evening of August 31 and only his girlfriend and Carter called his private phone line.

The following day, on September 1, Carter and Staedel went to the San Jose branch of First Nationwide Bank with Carter posing as Baro and attempted to withdraw money from Baro's account. A bank employee telephoned the Hayward branch where the account originated to verify Carter's identity. An employee at the Hayward branch, who knew Baro personally, took the call. Based on her familiarity with Baro's voice, the employee knew Carter was not Baro. Carter was unable to complete the transaction and left the bank. The same bank employee later listened to the voices from a police lineup and identified Carter as the individual whose voice she had heard on the telephone.

On September 7, Baro's mother found Baro dead in his Hayward residence. Baro was face down on his bed with a pillow over his head. Baro's wrists and legs were tied. He had been shot in the back of the head. Police recovered an expended cartridge on the bed next to his head that was fired from a .22-caliber pistol. One live round was found on the floor. The bedroom appeared to have been ransacked.

Autopsy evidence indicated the gun had been held against the skin when it was fired. Baro died from the bullet wound to the back of the head. The condition of the body suggested that Baro was killed on or about August 31.

Baro's personal property was recovered from Carter's bedroom, including his telephone answering machine with Baro's voice recording on it, a Macy's credit card, a J.C. Penney credit card, a bank card, jewelry, and watches. Carter's fingerprints were found on a receipt for a purchase using Baro's J.C. Penney credit card on September 1. Carter's fingerprints were also found on the interior passenger window of Baro's car. An AT&T calling card in the name of Baro's mother was found in the checkbook wallet that belonged to Erickson and was discovered in Carter's car. Baro's briefcase was discovered in Staedel's bedroom. Baro's vehicle was later found in a motel parking lot in downtown Hayward.

## III.

### *Jury Instructions, Verdicts, and Findings*

At Carter's second trial, the jury was instructed on two theories of first degree murder—premediated and deliberate murder and felony murder. (CALJIC Nos. 8.20, 8.21, 8.27.) The trial court instructed on felony murder related to the predicate crimes of robbery, kidnapping and kidnapping for robbery, in relevant part, as follows: "The defendant is accused in Count 1 of the Information with having committed the crime of murder, a violation of Penal Code Section 187. [¶] That section provides that every person who unlawfully kills a human being with malice aforethought or during the commission of robbery, kidnapping, or kidnapping for robbery, is guilty of the crime of murder in violation of 187 of the Penal Code. [¶] In order to prove such crime, each of the following 3 elements must be proved. [¶] Number 1, a human being was killed; [¶] Number 2, the killing was unlawful; and [¶] Number 3, the killing was done with malice aforethought or occurred during the commission of a robbery, kidnapping or kidnapping for robbery." The instruction also stated: "The unlawful killing of a human being, whether

8

intentional, unintentional or accidental, which occurs during the commission of a robbery, is murder of the first degree when the perpetrator had the specific intent to commit such crime."

As to the felony-murder special-circumstance allegations, the jury was instructed with a modified version of CALJIC No. 8.80, that stated in relevant part, as follows: "If you find the defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances are true or not true . . . [¶] Number One, that the murder was committed while the defendant was engaged in the commission of robbery. [¶] Number two, that the murder was committed while the defendant was engaged in the commission of kidnapping. [¶] Number three, that the murder was committed while the defendant was engaged in the commission of kidnapping for robbery. [¶] Those are the three special circumstance allegations. [¶] The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true. [¶] If you find beyond a reasonable doubt that the defendant was an aider and abettor or either the actual killer or an aider and abettor, but you are unable to decide which, then you must find beyond a reasonable doubt . . . that the defendant either *intended to kill* a human being or *intended to aid and abet another in the killing* of a human being *with an intent to encourage or facilitate the killing* in order to find the special circumstance to be true. [¶] On the other hand, if you find beyond a reasonable doubt that the defendant was the actual killer, you need not find that the defendant intended to kill a human being in order to find the special circumstance to be true." (Italics added.)

9

The jury was also instructed on liability for murder under the "natural and probable consequences" theory of liability for aiding and abetting the crime of murder or aiding and abetting an offense separate from murder where the natural and probable consequence of the separate offense was the commission of murder.

The jury found Carter guilty of first degree murder and that he personally used a firearm in commission of the murder. The jury found true each felony-murder special-circumstance allegation that Carter committed the murder while engaged in the commission of robbery, kidnapping, and kidnapping for robbery.

## IV.

### *Trial Court Ruling on Resentencing*

The trial court decided Carter's petition based on the transcripts and physical evidence from the second jury trial; the parties did not offer any new evidence at the evidentiary hearing. (§ 1172.6, subd. (d).) The court determined the evidence adduced at Carter's second trial established Carter was liable for first degree murder because he acted with intent to kill in aiding and abetting Staedel in the killing of Erickson. Although the court considered the preclusive effect of the jury's prior findings that Carter was guilty of special circumstance felony murder, it did not stop there. It went on to make its own detailed findings as to whether the prosecution was able to establish beyond a reasonable doubt that Carter acted with intent to kill, and concluded that it had. Specifically, the court found Carter acted with "express malice" while "directly aiding and abetting a murder."

## DISCUSSION

Carter first argues the jury's true findings on the felony-murder special circumstances did not preclude him from section 1172.6 resentencing relief

10

because the jury could have found the allegations true based "solely on his participation in a robbery during which a death occurred" without a finding that he acted with intent to kill. He next argues the court's factual finding that he intended to kill as part of his plan to kidnap and rob Erickson was not supported by substantial evidence. By reason of the trial court's review of the record and its independent findings, we need not consider Carter's first argument about the preclusive effect of the jury's findings of special circumstances. Instead we proceed to the merits and conclude substantial evidence supports the court's finding that the prosecution had proven beyond a reasonable doubt that Carter was liable for first degree murder under current law.

## I.

### *Applicable Law and Standard of Review*

"Generally, malice is an essential element of the crime of murder. (§ 187.) Malice may be either express or implied. It is express 'when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature.' (§ 188, subd. (a)(1).) It is implied 'when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' (*Id.*, subd. (a)(2).) Implied malice has ' "both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' . . . The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life.' " ' " (*People v. Johns* (2020) 50 Cal.App.5th 46, 57.)

Prior to 2019, the felony-murder and natural and probable consequences doctrines were exceptions to the actual malice requirement.

11

Under the old felony-murder doctrine, a defendant was liable for first degree murder if his or her confederate killed someone while the defendant participated in the commission or attempted commission of a qualifying felony. (Former § 189.) The necessary mental state was simply the intent to commit a qualifying felony. (*People v. Gonzalez* (2012) 54 Cal.4th 643, 654) superseded by statute as stated in *People v. Emanuel* (2025) 17 Cal.5th 867, 880.) Or, put differently, malice was *imputed* to the participant based on their willingness to commit a felony our Legislature deemed " 'inherently dangerous to life.' " (*People v. Chun* (2009) 45 Cal.4th 1172, 1184.)

Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) narrowed the felony murder rule significantly for defendants who were not actual killers and eliminated second degree murder liability based on the natural and probable consequences doctrine. (*People v. Strong* (2022) 13 Cal.5th 698, 703, 707, fn. 1 (*Strong*); §§ 188, subd. (a)(3), 189, subd. (e).) It also provided a resentencing procedure for those convicted of murder under the former law to have their convictions set aside if they could not be convicted of murder under the law as amended by Senate Bill No. 1437. (*People v. Lewis* (2021) 11 Cal.5th 952, 959; see § 1172.6.)

Under the resentencing procedure in section 1172.6, if a petitioner makes a prima facie case for relief, the trial court issues an order to show cause and (unless the prosecution stipulates to resentencing) holds an evidentiary hearing. (§ 1172.6, subds. (c) and (d).) At the evidentiary hearing, "the burden of proof [is] on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

When a person was not the "actual killer" and did not aid or abet the actual killer "with the intent to kill," section 189 now limits liability for first degree felony murder to a "person [who] was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2." (§ 189, subd. (e).) By adding the requirements of major participation and reckless indifference to section 189, Senate Bill No. 1437 incorporated the requirements for the felony-murder special circumstance of section 190.2, subdivision (d), as "those requirements [were] elucidated in" the California Supreme Court decisions, *People v. Banks*, *supra*, 61 Cal.4th 788 and *People v. Clark* (2016) 63 Cal.4th 522. (*Strong*, *supra*, 13 Cal.5th at p. 710.)

In reviewing a trial court's denial of a resentencing petition under section 1172.6, we review factual findings for substantial evidence, and we review de novo the court's application of the law to those facts. (*People v. Hill* (2024) 100 Cal.App.5th 1055, 1066.)

## II.

### *Analysis*

While the provisions of Senate Bill No. 1437 and related amendments eliminated liability for murder under the natural and probable consequences doctrine, they did not eliminate murder for someone who aids and abets a murder while acting with express malice. (See *People v. Gentile* (2020) 10 Cal.5th 830, 848, superseded by statute on other grounds as stated in *People v. Oyler* (2025) 17 Cal.5th 756, 836–837.) Rather, "[o]ne who directly aids and abets another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law." (*People v. Offley* (2020) 48 Cal.App.5th 588, 595–596.)

13

"Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*People v. Canizales* (2019) 7 Cal.5th 591, 602.) Here, the record amply demonstrates beyond a reasonable doubt Carter's intent to kill by his conduct and the surrounding circumstances. Carter borrowed a gun from a friend on August 28, two weeks prior to Erickson's murder. Three days later, Carter used the gun to rob and kill Baro, a gay man he met at a bar. Baro was found bound and fatally shot in the back of the head. The next day, Carter attempted to withdraw money from Baro's bank account posing as Baro. Carter kept the gun and used it in the killing of Erickson 10 days later. The earlier murder of Baro using the same gun, the parallels between the two killings, and their closeness in time thus evince Carter's intent to kill. (See, e.g., *People v. Thomas* (2023) 14 Cal.5th 327, 358–359.)

The trial court correctly determined, "[t]hese facts lead to the conclusion that the Petitioner contemplated that the abduction and robbery of Mr. Ericksen [*sic*] would necessarily involve using Shepard's firearm to kill Ericksen [*sic*] just as he had done with Mr. Baro." Carter does not dispute that the evidence of Baro's murder was admissible as evidence of his intent to kill Erickson. Indeed, as the trial court described, it was "[p]owerful evidence" of Carter's intent to kill Erickson.

The trial court identified additional evidence supported by the record to conclude that Carter acted with intent to kill: "[T]he evidence showed that [Carter], while acting with express malice, shot the victim at least twice with a gun he provided for committing the crimes against the victim. His co-defendant then used the same gun to inflict the fatal injury on the victim as [Carter] stood by and watched. Both defendants then disposed of the victim's

14

car and used his credit cards and bank account for financial gain. These simple facts conclusively establish [Carter's] liability for directly aiding and abetting a murder. . . . [T]he evidence of his conduct . . . establish[es] beyond a reasonable doubt that he acted with intent to kill the victim."

Carter nevertheless argues that there was contrary evidence consistent with a kidnapping and robbery that had gone "fatally wrong." However, the mere existence of contrary evidence does not mean that the trial court's finding is not supported by substantial evidence. A trial court's "judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order." (*Ibid.*) Carter has failed to carry this burden.

Finally, the fact that Carter may not have fired the fatal bullet does not diminish his liability for first-degree murder. (See *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1143–1146 [finding first-degree murder liability for non-shooters who participated in a drive-by shooting].) The totality of the evidence established that Carter kidnapped Erickson, drove him to a remote location, disposed of Erickson's car away from the scene, shot Erickson twice from a close range, handed the gun to Staedel, watched him fire the fatal shots without intervening, and went on a shopping spree with Erickson's credit cards the day after the murder.

There was substantial evidence supporting the trial court's finding that Carter intended to kill in a planned kidnapping and robbery of Erickson.

Accordingly, the court did not err in denying Carter's petition for resentencing.[5]

## DISPOSITION

The judgment is affirmed.

_____
Miller, J.

WE CONCUR:

_____
Stewart, P. J.

_____
Desautels, J.

A170792, *People v. Carter*

---

[5] In light of our conclusion, we need not consider Carter's so-called "remedial" issues to be considered if the matter were to be remanded.