Filed 7/22/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B308780 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. A639776 |
| v. | |
| RODERICK WAYNE MITCHELL, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Tammy Chung Ryu, Judge.  Affirmed.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda Lopez and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

——————————

Roderick Wayne Mitchell joined his older brother's gang, which celebrated violent acts done "just for the fun of it."  With

his fellow gang members, Mitchell took part in these crimes. Then came this murder. While at a pool hall at 2 o'clock in the morning, Mitchell and his brother decided to rob someone and selected a victim: the driver in a nearby car waiting for food at a drive-through. Along with a third accomplice, Mitchell waited while his brother confronted the driver, who tried to drive away. The brother fired at the fleeing driver. The gunfire did not startle or deter Mitchell: instead of withdrawing from the robbery when shots rang out, Mitchell pursued the car with his brother. It crashed nearby. The brother gave the gun to Mitchell and rifled the victim's clothes for money. The brothers split the cash evenly. Mitchell did not render or summon aid for the victim or check his pulse or breathing. Rather, he returned to the pool hall with his brother. The victim, hit by five shots, died in the car.

As a matter of law, these facts establish Mitchell was a major participant in the robbery who showed reckless indifference to human life. Mitchell planned a violent crime with a violent man, and when that man started shooting, Mitchell stuck with the plan and continued with the violent crime. Mitchell did not minimize risk or show concern for his victim. Rather he held the gun, shared the take, and left the body.

We affirm the trial court's findings. Mitchell's role was major. His indifference was evident. We share the trial court's view that "there's no other way of interpreting that."

We also hold, following a line of unbroken authority, that the trial court could rely on sworn statements Mitchell made to the parole board when Mitchell petitioned to be resentenced. The point of this petitioning process is to find truth and to do justice. In this quest, the facts must matter. It is fair to permit the court

2

to evaluate how Mitchell described his role in his crime.  The Legislature set the parameters for admissible evidence in this process, and these parameters invite all admissible evidence, which here includes Mitchell's parole board statements.

It is certainly true Mitchell faced different incentives in the parole hearing and in his resentencing petition.  The parole process rewards acceptance of responsibility while the resentencing process here rewards a diminished role in criminal events.  Despite these differing incentives, the Legislature did not bar consideration of parole hearing statements.  There is no statutory or constitutional basis for excluding this evidence.  When individuals seek to gain a sentencing advantage, it is fair to examine their own words to see if they deserve it.  If they claim their culpability is low but their words show otherwise, this is pertinent.

Undesignated statutory citations are to the Penal Code.

## I

In 1988, Mitchell pleaded guilty to first degree murder.  As part of his plea, Mitchell expressly waived the right against self-incrimination.  Mitchell entered his plea after confessing to police and before a preliminary hearing.

A police report documented Mitchell's confession.  On appeal, Mitchell quotes this confession in full and has abandoned trial court objections to it.  The report recounts:

"[Mitchell] stated he and his brother observed the victim and decided to rob him.  They approached the victim and demanded money.  When the victim refused [Mitchell] stated his brother shot the victim.  As the victim drove from the location an additional shot was fired at the victim which broke the rear vehicle window.  [Mitchell] continued to say that after they heard

the victim's vehicle crash, they went to his location and took approximately $200.00 from his pocket. [Mitchell] stated he took $100.00 and his brother kept $100.00 of the victim's money."

The trial court sentenced Mitchell to 25 years to life in prison with the possibility of parole.

In 2017, Mitchell described his crime under oath at a parole consideration hearing. The transcript of this hearing runs to 80 pages.

Mitchell recounted his knowledge of and relationship with the man—his brother—with whom he planned and committed this crime. This evidence supported the inferences that Mitchell's brother had committed violent crimes and that Mitchell knew this history because Mitchell had participated in it.

Following his brother, Mitchell joined the Crips at age 15. After that, "the majority of people that I'm hanging around with are gang members." With his gang, Mitchell was "[s]elling drugs, uh, robbing, stealing, arson." "[O]ne day we sat around and—and set a fire on a—it was a truck, just for—just for the fun of it and everybody just looked and—and—we drank alcohol and it was like a—a party." Close to age 18, Mitchell began carrying a gun. "In the gang life it was, uh, celebrated to see someone commit a violent act on somebody else." "[W]e did celebrate just committing violent acts just for—just for the fun of it."

Mitchell described the specific crime to which he had pleaded guilty. The italics are ours.

Mitchell was staying with his brother. They were at a pool hall after midnight and "we were getting high at the moment." "We decided to rob somebody so we looked around and seen [the victim], uh, at a food service, so the three of us walked over

4

there." Mitchell explained his brother had a gun. "So, as we stood over there looking out he went around the building and [the victim] was in his car at a drive-thru, so he went around the building to confront [the victim]. At that time, uh, we was just standing by, watching out. So about a couple of minutes went blowing by and we heard gunshots and [the victim] pulled out of the drive—the drive-thru and made a left, he made a hard right and crashed into the back of a church. So at that time, we followed the car in which, uh, we went down there and my brother went on, took his money while we held the gun and after that—

"[Q]: You said while we held the gun?

"[A]: Right.

"[Q]: That sounds like more than one person is holding the gun and who's holding the gun?

"[A]: *I held the gun while we went into [the victim's] pocket.*

"[Q]: What are you saying to him at this point?

"[A]: Hurry up, let's go. You know, if anybody sees us we are going to be in trouble."

Mitchell said he assumed the driver was dead, but he did not learn with certainty about the death until after his arrest. He claimed at the time of the shooting "we had no idea that he would—he had been murdered."

The hearing panel found Mitchell was not suitable for parole. Mitchell's extensive prison disciplinary record led the panel to conclude Mitchell posed a danger to the public if released. But the panel also signaled Mitchell more recently had been on the right track, noting he would "probably stand a pretty good chance" if he would refrain from further misconduct and would file a petition to advance his next parole hearing.

In 2019, Mitchell filed a petition for resentencing under former section 1170.95 (now § 1172.6).

Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) To minimize awkwardness from this renumbering, we refer to "the statute" or to "former section 1170.95."

Mitchell filled out a form saying, "I, Roderick Mitchell, declare as follows: [¶] . . . [¶] I was not a major participant in the felony or I did not act with reckless indifference to human life during the course of the crime or felony." Mitchell declared "under penalty of perjury that the above is true" and signed and dated his declaration.

The prosecution opposed Mitchell's petition and supplied a transcript of the 2017 parole hearing, a probation officer's report, and relevant police reports.

Mitchell filed a reply and objected to the parole hearing transcript. He argued, among other things, the transcript was hearsay and was protected by use immunity, and it was unfair to use this evidence against him.

The trial court appointed counsel, issued an order to show cause, and held an evidentiary hearing.

At the hearing, the court stated (with our italics), "I think, before we proceed, we do have to have a ruling on what can be considered at this hearing. [¶] . . . [¶] The court . . . has permitted additional evidence that would shed light on whether Mr. Mitchell was either a major participant in the underlying felony which is robbery in this case and acted with reckless disregard for human life. [¶] . . . [¶] [T]he objection that [the defense] articulated [about the] right to confront or hearsay objections would not apply to Mr. Mitchell's own statements.

6

And . . . those would be the only evidence I would consider[:] . . . his statements *at the parole hearing and also in the police report.* [¶] . . . [¶] So I am going to consider defendant's statements only as they're contained in *the parole board hearing transcript and the police reports.*"

Both sides argued. Neither presented witnesses.

The trial court denied Mitchell's petition with a thoughtful and extensive analysis.

"I find that Mr. Mitchell was a major participant in the robbery.

"He agreed to rob someone with the brother, yes, for money to buy more drugs. That may have been the primary motive. And he actually helped pick out the victim with the brother. They agreed who the victim was going to be. They saw him. I think it was a drive through or the parking lot of the restaurant. And they—he, the defendant, with his brother—and there was another person present—agreed to rob that particular victim.

"And he did help rob the victim. . . . But do you remember he was the one who held the gun? The brother gave him the gun, and the defendant held the gun while the brother went through the injured victim's body and personal effects to get the 140 or $190 from the victim.

"Defendant held the gun although defendant did state I think maybe at the parole board hearing he thought that at that point in time the victim may have been dead. But it could also be interpreted that he held the gun just in case the victim resisted. Either way he was a major participant in the robbery. That's the finding of this court.

"The real issue in the court's mind is did he act with reckless indifference to human life? It is worth noting that the

7

shooter and the killer in this case was Mr. Mitchell's brother whom he hung out with or lived with and did drugs with and belonged to the same gang with during that period of time.

"It is sad that Mr. Mitchell was just a young person at the time. I think he was 18. So—and that he was abusing drugs. But being high or choosing to get high is not a defense to committing a robbery in this case.

"And because he was—it was his brother and they belonged to the same gang and they did drugs together, there is a strong indication that he knew or should have known his brother would be armed or use some sort of a weapon. There's no indication that Mr. Mitchell was surprised at all when the gun was actually used. He never mentioned, I was shocked when my brother shot at the victim. I did not know he had a gun. There was nothing like that ever indicated by Mr. Mitchell in all the statements he made about his involvement in this incident which all goes to support the argument or the assumption that Mr. Mitchell knew that his brother had a gun or intended to use a weapon in the robbery.

"And [the prosecutor] makes a very good point that the shooting actually happened prior to the actual robbery taking place which meant that Mr. Mitchell had the opportunity to stop his involvement. When the shots were first fired at the victim, that's when Mr. Mitchell—even if he did not know his brother had a gun or was going to use a weapon or was going to try to kill anyone, that was the point in time when he could say, hey, I did not know you were going to try to kill someone, try to rob them. . . . But he didn't. He just stood there, didn't try to stop his brother when his brother shot again.

"The victim had five gunshot wounds. The second time his brother shot as the victim drove away was what shattered the rear window of the car. And that's—I believe that is when the victim actually crashed into, I think, a church or a parking lot.

"So the defendant's brother, codefendant, the shooter shot at the victim. Defendant did not thereafter distance himself or walk away being surprised that a gun was used or someone was going to get killed in this robbery, did not try to stop his brother when his brother shot again. Let's say there was a surprise and it happened really quickly and there was no time for Mr. Mitchell to actually reflect and respond. However, but then after that happened, instead of walking away then after the second round of shots, he actually ran with a codefendant to the victim to continue the robbery or complete the robbery.

"And on top of that, he held a gun on the victim basically. If he truly believed the victim had been killed or there was no way that the victim can resist or anything like that, there was no need for him to hold the gun. They could have put away the gun. But he held the gun. He did not—at that point in time, he assisted his brother to rob the victim while holding the gun.

"And he didn't try to assist the victim at all. I know it sounds kind of [incredible] to expect somebody to participate in a robbery that a gun was used that they would thereafter call for help for the victim. But that would be an indication that somebody did not intend to aid a robbery where someone was going to die. That would indicate that he did not, in fact, act with reckless indifference to human life, . . . that he did not intend to aid in that regard, aid just in the robbery but not in killing someone in the commission of that robbery. That is the reckless indifference.

"Did he act with reckless indifference?  I would have to say, yes, he did despite the fact that he was only 18 and it was his brother that he was with.  And he may have been high on drugs.  He acted with reckless indifference to human life when his brother shot at the victim.  And he still went with the brother to get the money from the victim, held the gun while his brother did that.  That is, I find, an action taken with reckless indifference to human life.  To me there's no other way of interpreting that.

"So I am going to find that [the] People met their burden of proof that defendant is ineligible for relief because he acted with reckless indifference to human life in addition to being a major participant in the robbery.

"This is a sad situation, as [defense counsel] pointed out, that Mr. Mitchell was just a teenager at the time and he was—he may have been abusing drugs that affected him in some way.  But our law does not provide an excuse for that kind of action just because you are 18 or you are abusing drugs.  Somebody got shot five times and killed here.  And he was robbed while he was sitting in his car bleeding to death.

"And Mr. Mitchell being young at the time is not a reason for this court to grant this petition because he was a major participant who acted with reckless indifference to human life.

"So the petition under 1170.95 is denied."

## II

Mitchell's first contention is that the trial court erred by considering the parole hearing transcript.  He argues the incentives facing people seeking parole, and concerns regarding self-incrimination and the burden of proof, make it improper to consider such evidence in proceedings under the statute.

10

This contention is erroneous. There is no categorical exclusion of a defendant's sworn parole hearing testimony in this process. There never has been, and it would contravene the statute's language and purpose to create one now.

The statutory language shows parole hearing transcripts are proper evidence in this setting. Before and after its recent amendment, the statute permitted the parties to rely on "new or additional evidence" in these hearings. (Former § 1170.95, subd. (d)(3) [now § 1172.6, subd. (d)(3)].)

Through Senate Bill No. 775 (2021–2022 Reg. Sess.), effective January 1, 2022, the Legislature clarified the scope of admissible evidence at the evidentiary hearing. (Stats. 2021, ch. 551, § 2.) The statute now specifies the Evidence Code governs the admissibility of evidence. This shows the Legislature focused on the issue of admissibility and made the statute govern these proceedings. The Legislature could have incorporated the exclusionary principles Mitchell advocates but did not.

The parole transcript is and was properly admitted evidence. The trial court diligently considered Mitchell's evidentiary objections to the parole transcript and to the police reports. To overcome hearsay objections, the court limited its consideration to the admissions of a party opponent. (See Evid. Code, § 1220 [hearsay exception for party admissions].)

Mitchell's briefing to us does not argue the Evidence Code bars this evidence.

As a matter of statutory *wording*, then, this parole transcript was proper evidence.

The same result follows when we examine the statute's *purpose*. (See *People v. Lewis* (2021) 11 Cal.5th 952, 962 (*Lewis*) [construe the statute to achieve its purpose].) The overall goal of

the petitioning process here is to make the punishment fit the crime in a precise and particularized way. The Legislature sought to ensure murder culpability is commensurate with a person's individual actions. (*Id.* at p. 971.)

That takes facts.

The Legislature responded to longstanding critiques of murder doctrine by creating a process to ameliorate past excesses that created sentences judged to be too long and to resentence *where appropriate*. So the focus is on examining the truth of what happened to evaluate whether to reduce an individual's sentence so the punishment fits the crime. (See *People v. Gentile* (2020) 10 Cal.5th 830, 838–839, 846–847.)

The Legislature meant for trial courts to zero in on the "individual culpability" of each petitioning defendant. (See Stats. 2018, ch. 1015, § 1(d).) "A person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (*Id.*, § 1(g).) This is essential to serve the "bedrock principle of the law and of equity" that people be punished only for their own actions. (*Id.*, § 1(d).) Tailoring punishment precisely would address fairly the culpability of the individual and would assist in the reduction of prison overcrowding, which has resulted in part from lengthy sentences that are not commensurate with the culpability of the individual. (*Id.*, § 1(e).)

Contrast what the Legislature did do with an alternative it did *not* enact. To combat overincarceration, a different approach would have been to pass a blanket rule: for example, "no one shall remain in prison for more than X years." That categorical approach would not turn on factual details. But the statute takes the opposite approach: tailor sentences to the facts of each case.

12

It would contravene this goal of individualizing punishment for courts to blind themselves to the individualized facts of the case. This appeal illustrates how a parole transcript can be a valuable source of information about a particular defendant's actions, and thus potentially important in the work of aligning individual punishment with individual culpability. This work benefits from the kind of evidence a parole transcript can provide.

Mitchell relies on a line of cases starting with *People v. Coleman* (1975) 13 Cal.3d 867 (*Coleman*), in which courts were concerned about using a defendant's statements *at a later criminal trial* (or a later point in the original prosecution) and adopted "a limited species of use immunity grounded in California's constitutional guarantee against self-incrimination." (*People v. Carter* (1993) 19 Cal.App.4th 1236, 1248.) (E.g., *Coleman*, at pp. 876–877, 889, 892 [probationer's testimony at revocation hearing inadmissible in later criminal trial]; *Ramona R. v. Superior Court* (1985) 37 Cal.3d 802, 809–810 (*Ramona R.*) [minor's statements at juvenile fitness hearing and to probation officer inadmissible in later criminal trial]; *In re Jessica B.* (1989) 207 Cal.App.3d 504, 520–521 [parent's testimony in dependency proceedings and statements in court-ordered therapy inadmissible in prosecution for child abuse].)

For the reasons outlined in *People v. Myles* (2021) 69 Cal.App.5th 688 (*Myles*), we reject Mitchell's arguments. *Myles* held a parole hearing transcript is admissible as "new or additional evidence" under the statute. (*Id.* at pp. 697–703.) It explained why such a rule is necessary in plea cases and why extending judicially created use immunity to petitioner-initiated collateral proceedings like these is inapt. (*Id.* at pp. 699, 704–706.) As other courts have done, we follow *Myles*'s well-reasoned

13

analysis. (E.g., *People v. Anderson* (2022) 78 Cal.App.5th 81, 89–93 (*Anderson*).)

Mitchell's reliance on *Coleman* turns on equating the petitioning process here with a criminal prosecution. This attempted equation is mistaken.

A petition under former section 1170.95 is not a criminal prosecution. (*People v. Silva* (2021) 72 Cal.App.5th 505, 520.) It is the *opposite* of a criminal prosecution. A criminal prosecution can only hurt a defendant and can never help. The process here is the reverse: it can only help the defendant and can never hurt.

The statute offers petitioning prisoners the possibility of getting out sooner. From the defendants' perspective, this process is all gain and no cost. That can never be said of a criminal prosecution. Criminal prosecutions heavily burden defendants they target.

Many constitutional protections that characterize burdensome criminal prosecutions thus do not apply in this ameliorative process. (See *People v. James* (2021) 63 Cal.App.5th 604, 610 (*James*) ["we agree with the many courts that have held that a convicted person litigating a section 1170.95 petition does not enjoy the rights that the Sixth Amendment guarantees to criminal defendants who have not yet suffered a final conviction"]; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156 ["the Legislature's changes constituted an act of lenity that does not implicate defendants' Sixth Amendment rights"].)

For instance, there is no constitutional *right to counsel* at the outset of this process. (*Lewis*, *supra*, 11 Cal.5th at p. 973.)

There is no constitutional *right to trial by jury*. (*James*, *supra*, 63 Cal.App.5th at p. 609; cf. *People v. Perez* (2018) 4 Cal.5th 1055, 1063–1064 [an evidentiary hearing on a petition for

resentencing under Proposition 36 does not trigger the right to a jury trial because that legislative act of lenity does not implicate Sixth Amendment rights].)

There is no constitutional *right against double jeopardy*. (*People v. Hernandez* (2021) 60 Cal.App.5th 94, 111.)

There is no constitutional *right against self-incrimination* in the process. (See *Myles*, *supra*, 69 Cal.App.5th at pp. 704–706; see also *People v. Lopez* (1999) 71 Cal.App.4th 1550, 1554 [when a defendant has pleaded guilty and time to appeal has run without an appeal, the defendant's privilege to avoid compelled self-incrimination with regard to the facts underlying the conviction no longer exists].)

Mitchell's counsel conceded at oral argument that there is no Fifth Amendment right against self-incrimination here. That is correct as a matter of law. Yet his argument for use immunity is built on cases that are tied to the right against self-incrimination. (See *People v. Collins* (1986) 42 Cal.3d 378, 386 ["*Coleman* and *Ramona R.* were concerned with protecting a fundamental constitutional right—freedom from self-incrimination during a criminal trial"]; see also *Anderson*, *supra*, 78 Cal.App.5th at p. 91 ["the existence of the defendant's constitutional privilege against self-incrimination in the subsequent criminal trial was integral to the justification for the exclusionary rule announced in *Coleman*"]; *id.* at p. 93 ["Where the privilege against self-incrimination is not implicated, the rationale for immunities at issue in *Coleman* and *Ramona R.* disappears"].)

This statute set up a beneficial process at odds with a shadow right against self-incrimination. This resentencing process could not even begin until Mitchell gave the court *his*

statement, under oath, about his role in the crime to which he pleaded guilty. (See former § 1170.95, subd. (b)(1)(A) [now § 1172.6, subd. (b)(1)(A)] [to commence the process, petitioning defendants must submit "a declaration by the petitioner"].)

Mitchell wrongly protests the parole board promised him use immunity when it told him that "[n]othing that happens here today is going to change the court findings as we're not here to retry your case." What the board said was true, and it did not create use immunity. The point of trial is to determine guilt or innocence, and Mitchell's guilty plea settled that issue. The parole board was not there to retry Mitchell's guilt or innocence. It was there to hear what he had to say about himself and his actions and prospects. The board did not promise use immunity.

The parole process emphasizes the importance of voluntary, unvarnished truthtelling. California regulations for parole hearings provide, with our emphasis: "The facts of the crime shall be discussed with the prisoner *to assist in determining the extent of personal culpability*." (Cal. Code Regs., tit. 15, § 2236.) But the board "shall not" require an admission of guilt and "shall not" hold a prisoner's refusal to discuss the crime against the prisoner. (*Ibid*.)

The trial judge is ideally situated to determine whether the incentives at a specific parole hearing mesh with the statute's goal of aligning punishment with true culpability. When there are valid reasons to doubt the probity of a parole hearing statement, the trial judge can hear and appraise arguments in the case's context and accord the statement due weight. Trial judges are expert at evaluating—word by word—whom and what to believe in individual situations. No reason exists to preempt

16

trial judges' particularized evaluation with our own blanket rule of exclusion.

Mitchell contends it is unfair to use his own words against him. What is the unfairness, exactly? At the parole hearing and in his petition for resentencing, Mitchell sought to reduce the punishment for a crime to which he pleaded guilty. Contrary to Mitchell's claim, it is fair and indeed sensible to say a convicted person's own words are pertinent when that person petitions for the benefit of resentencing.

The statute strives to achieve justice. It would be unjust for Mitchell to gain an advantage his sworn description shows he does not merit.

The trial court did not err in considering Mitchell's parole hearing testimony.

### III

Mitchell initially accepts our standard of review is sufficiency of the evidence but then argues we should independently review the denial of his petition because the trial court heard no live testimony. He cites *People v. Vivar* (2021) 11 Cal.5th 510 but ignores *Vivar*'s footnote 7, which expressly cautioned against extensions of the type Mitchell urges. The proper standard of review thus defers to the trial court's factfinding. We review the trial court's findings for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

We view the facts in the light most favorable to the People. In this process, we presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence, whether direct or circumstantial. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022; see also *People v. Clark* (2016) 63 Cal.4th 522, 610 (*Clark*).) We must accept factual inferences

17

in favor of the trial court's ruling. (*People v. Zamudio* (2008) 43 Cal.4th 327, 342, 346, fn.7, 357.) Where Mitchell urges contrary and conflicting inferences, then, we must reject them.

Substantial evidence supports the finding, beyond a reasonable doubt, that Mitchell was a major participant in a felony who acted with reckless indifference to human life. (See § 189, subd. (e)(3); see also *People v. Douglas* (2020) 56 Cal.App.5th 1, 7, 9 [explaining how former section 1170.95 narrowed felony murder and how appellate courts assess a petitioner's culpability].)

Mitchell was a *major participant*. Mentally, Mitchell helped decide to rob, helped plan the robbery technique, and helped select the victim. Physically, Mitchell was on the scene from start to finish. Tangibly, he helped with the gun and split the proceeds equally with the shooter: his fellow gang member and brother. At every stage, Mitchell was a full partner in crime.

Mitchell was *recklessly indifferent to human life*. We analyze this issue as the trial court did, with the guidance of the now-familiar decisions in *Banks*, *Clark*, and *Scoggins*. (*People v. Banks* (2015) 61 Cal.4th 788 (*Banks*); *Clark*, *supra*, 63 Cal.4th 522; *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*).) These state decisions charted a " 'spectrum of culpability' " set forth in two opinions from the Supreme Court of the United States. (*Scoggins*, at p. 675, quoting *Banks*, at p. 811.) These two federal decisions are *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*).

"[I]t is important to consider where the defendant's conduct falls on the 'spectrum of culpability' that *Enmund* and *Tison* established. . . . On one end of the spectrum is Enmund, 'the minor actor in an armed robbery, not on the scene, who neither

18

intended to kill nor was found to have had any culpable mental state.' " (*Scoggins*, *supra*, 9 Cal.5th at p. 675, citations omitted.) The other end of the spectrum are the 19 and 20 year old defendants in the *Tison* case, who were major participants who acted with reckless indifference to human life, even though neither of them shot any murder victim. The Supreme Court of the United States, speaking through Justice O'Connor, ruled it was therefore constitutional to impose the death sentence on the youthful *Tison* defendants. (*Tison*, *supra*, 481 U.S. at pp. 142, 151–152, 158.) The California Supreme Court embraced these federal decisions as a matter of state law. (E.g., *Scoggins*, at p. 675 [*Enmund* and *Tison* are "instructive"].)

*Scoggins*, the most recent of any of these decisions, summarized the earlier ones and established the proper approach. We are to analyze the totality of the circumstances to determine whether Mitchell acted with reckless indifference to human life.

"Relevant factors include: [1] Did the defendant use or know that a gun would be used during the felony? [2] How many weapons were ultimately used? [3] Was the defendant physically present at the crime? [4] Did he or she have the opportunity to restrain the crime or aid the victim? [5] What was the duration of the interaction between the perpetrators of the felony and the victims? [6] What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? [7] What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)

We address these seven points, one by one.

19

*First, did the defendant use or know that a gun would be used during the felony?* Mitchell and his brother formulated a plan to rob a man in a car. A gun was necessary for their plan, for otherwise a driver would simply accelerate and escape with the money that was the object of the design. By jointly composing and pursuing this plan, Mitchell subjectively and consciously disregarded " 'the significant risk of death' " his actions necessarily created. (*Scoggins, supra*, 9 Cal.5th at p. 677, quoting *Banks, supra*, 61 Cal.4th at p. 801.)

*Second, how many weapons were ultimately used?* The gun was used, to deadly effect, because the driver did try to accelerate and to escape with his money.

*Third, was the defendant physically present at the crime?* Mitchell was physically present at every stage of the crime: planning, execution, dividing the spoils, and flight. In the trial court, Mitchell's counsel conceded his presence at the scene.

*Fourth, did the defendant have the opportunity to restrain the crime or aid the victim?* Mitchell had the opportunity to restrain the crime and to aid the victim. At the outset, Mitchell could have rejected the planned crime or could have adjusted the method to take victim welfare into account. There was none of that.

Once the gunfire started, Mitchell worked to complete the robbery, not to care for the victim. The police report showed two rounds of shooting. The first was when the victim refused the brother's robbery demand. The second was when the victim tried to escape by driving away. The interval separating these rounds gave Mitchell options. He had the chance to tell his brother to stop the shooting. He could have tried to call off the plan. Or he could have fled the scene. During this time Mitchell had no way

to know the victim's condition. Had he cared about the victim's well-being, Mitchell could have shown it.

Mitchell never moved away from the violence. He went to the crashed car to help rob the driver. These actions support the trial court's inference the gunshots were unsurprising to him.

Mitchell held the gun his brother gave him and told his brother to hurry. He argues he assumed the victim was dead, so his actions after the shooting do not show indifference to his victim's plight. But Mitchell also swore he learned only later, after his arrest, that the victim had died. He claimed at the time of the shooting "we had no idea that he would—he had been murdered."

Mitchell never checked for a pulse or for breathing. (Cf. *Scoggins*, *supra*, 9 Cal.5th at p. 680 ["Scoggins walked over to the crime scene and checked if [the victim] was still breathing after the shooting"].)

In a substantial evidence review, we draw factual inferences in favor of the trial court's analysis. Mitchell was not positive the driver was dead, and the fair inference is that Mitchell held the gun to guarantee the wounded driver would not hamper the robbery.

When the circumstances allow different inferences, defendants' actions after shootings "may not be very probative" of their mental state. (*Scoggins*, *supra*, 9 Cal.5th at p. 679.) This rule discounts the weight of the aid factor in some circumstances, but the factor remains an appropriate consideration.

Mitchell's case lacks the ambiguity present in the *Scoggins* case. There, the defendant came to the crime scene, checked if the victim was breathing, and behaved calmly. This conduct was ambiguous: it could demonstrate he had anticipated lethal force

21

and was unsurprised by the "deadly turn of events," or, conversely, he believed he lacked culpability and intended to aid. (*Scoggins*, *supra*, 9 Cal.5th at p. 680.)

No one suggests Mitchell attempted to aid the recently shot victim in any way. Nor did Mitchell flee after the shooting, which would support his rejection of his brother's actions. (See *Clark, supra*, 63 Cal.4th at p. 620.) Instead, while the victim lay bleeding, Mitchell's only manifested concern was to rob the man.

That was cold. There is no ambiguity. Mitchell's action and inaction showed indifference.

*Fifth, what was the duration of the interaction between the perpetrators of the felony and the victims?* The duration was brief. This was because the frightened victim tried to flee. This does not show Mitchell had compassion or regard for the victim.

*Sixth*, *what was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?* Mitchell's knowledge of his confederate's propensity for violence was considerable. As the trial court found as a fact, the man was "Mitchell's brother whom he hung out with or lived with and did drugs with and belonged to the same gang with during that period of time."

The record amply supports this factual finding, to which we defer. This older brother brought Mitchell into the gang, and after that Mitchell mainly hung out with fellow gang members, presumably including his brother. With them Mitchell engaged in a variety of crimes: "robbing, stealing, arson." "In the gang life it was, uh, celebrated to see someone commit a violent act on somebody else." "[W]e did celebrate just committing violent acts just for—just for the fun of it."

Beyond being siblings, Mitchell and his brother were long-time fellow Crips, and they lived together, hung out together, and did drugs together. From years of experience, Mitchell knew his fellow gang members had a history of violence and of celebrating that violence. For Mitchell, his older brother was a known quantity.

Mitchell planned the robbery with this knowledge of his brother and this history. The inference must be that Mitchell knew his robbery partner could resort to violence "just for the fun of it."

*Seventh, what efforts did the defendant make to minimize the risks of violence during the felony?* Mitchell made no effort to minimize the risks of violence. He concedes this on appeal. This abandon shows indifference to the risk to human life.

Under the *Banks-Clark-Scoggins* analysis, this case is not close. Mitchell was indifferent to the risk to human life, and his disregard involved a gross deviation from the standard of conduct that a law-abiding person would observe in his situation. (*Scoggins, supra*, 9 Cal.5th at p. 677.)

Mitchell says the "anticipated proceeds" from the robbery likely were too small to give him reason to expect lethal force. The better inference, the one consistent with the trial court's analysis, is that the victim's life was worth little to Mitchell.

Mitchell argues his crime was a " 'garden variety' armed robbery." The Supreme Court explained this phrase applies when "the only factor supporting reckless indifference to human life is the fact of the use of a gun." (*Clark, supra*, 63 Cal.4th at p. 617, fn. 74.) In this case, by contrast, most factors counter Mitchell's petition for the benefit he seeks.

We ascribe meaning to Mitchell's actions despite his age. Youth can distort risk calculations. Yet every 18 year old understands bullet wounds require attention. The fact of youth cannot overwhelm all other factors. (See *Tison*, *supra*, 481 U.S. at pp. 142, 151–152, 158 [death sentence for 19 year old was constitutional because he was a major participant who acted with reckless indifference].) Weight appropriate to Mitchell's youth is overborne here by the *Banks-Clark-Scoggins* factors that show Mitchell's indifference to his victim's life. As the trial court rightly concluded, "Mr. Mitchell being young at the time is not a reason for this court to grant this petition because he was a major participant who acted with reckless indifference to human life."

Mitchell presents sympathetic facts about his childhood circumstances. These facts are not pertinent to whether Mitchell was recklessly indifferent at the time of his crime, but they can be appropriate to the question of whether Mitchell should now be released. The parole board delved empathetically into a review of Mitchell's life and prospects, including the many factors suggesting Mitchell remained a risk to public safety. Transforming petitioning under former section 1170.95 into an extra-statutory supplement to the parole process would be unjustified, however: the statute and the case law provide no basis for this expansion—which would be substantial if it were to be comprehensive—and the parole board has access to extensive assessment information unavailable to parties and courts in the former section 1170.95 context.

The trial court correctly concluded Mitchell remained liable for felony murder and properly found Mitchell was ineligible for relief.

## DISPOSITION

We affirm the trial court's order denying Mitchell's resentencing petition.

WILEY, J.

I concur:

HARUTUNIAN, J.*

---

\* Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**STRATTON, P. J., Dissenting.**

As distasteful as it may be to dissect a defendant's participation in events resulting in murder, precedent commands us to do so to arrive at a just result. Dissect we must. We are tasked with separating "garden variety" armed robberies from more serious offenses. (*People v. Clark* (2016) 63 Cal.4th 522, 617 & fn. 74 (*Clark*).) That a person can agree to participate in an armed robbery and still not satisfy the requirements of reckless indifference under our caselaw underscores the precision with which we must judge the evidence of appellant's actions.[1]

---

[1] I find the majority's rendition of the facts unreliable. The unsupported inferences are legion. There is no evidence the brothers had a long history of violent crime together; there is no evidence one way or another whether appellant was startled when his brother opened fire. The evidence is that the brothers ran after the victim's car *after* they heard it crash nearby. They did not rifle through the victim's clothes together. There is no evidence whether appellant knew about his brother's past crimes. There is no evidence whether appellant expressed surprise at the unfolding events.

The majority treats appellant's testimony at the parole hearing as though it were the result of a focused police interrogation instead of what it was – a hearing to determine if appellant was ready to be paroled. The majority has taken appellant's direct answers to direct questions by the parole commissioners and extrapolated to make inferences on issues the commissioners never raised and appellant was never asked about. In another vein, when a statement suits the analysis, the majority relies on general statements in police reports rather than appellant's more specific parole board testimony. Another reason not to allow this type of testimony as it is rife for abuse.

Therefore, I dissent. This is a garden variety armed robbery. The evidence is insufficient to support a finding of reckless indifference to human life. I also would hold that the People's use of appellant's testimony before the parole board violated *People v. Coleman* (1975) 13 Cal.3d 867 (*Coleman*).

I.    Reckless Indifference

In 1988 when he was 19 years old, appellant pleaded guilty to first degree felony murder. He entered the plea before the preliminary hearing so there was no testimony or evidence on record against him. At the evidentiary hearing, the only evidence presented by the People was appellant's testimony before the parole board considering his suitability for parole 30 years after the conviction. At the evidentiary hearing, the trial court stated it would not consider any statements other than statements by appellant. I understand that to mean the trial court did not consider the hearsay police reports the People submitted to the court along with the parole board transcript. Neither should we.

Our Supreme Court has set out factors to consider in determining whether a defendant is a major participant in a felony murder who acted with reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th 522 [factors for reckless indifference]; *People v. Banks* (2015) 61 Cal.4th 788 (*Banks)* [factors for major participant].)[2] Under *Clark* reckless indifference is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Clark,* at p. 616.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim,

---

[2]    It is unnecessary to decide whether appellant was a major participant in the crime if the evidence of reckless indifference is sufficient. (*Clark*, *supra*, 63 Cal.4th at p. 614.)

2

even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) Recklessness has both a subjective and an objective component. (*Ibid.*) Subjectively, the defendant must consciously disregard risks known to him. Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,'" that is, whether defendant's conduct "'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.'" (*Ibid.*) Notably, the absence of anything in the criminal "plan that one can point to that elevated the risk to human life beyond those risks inherent in any armed robbery" was a factor the *Clark* court analyzed in determining whether reckless indifference had been shown. (*Id.* at p. 623.)

*Clark* sets forth the questions to be asked and answered in determining whether a defendant acted with reckless indifference: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 [summarizing *Clark* factors].) Here the evidence does not come close to satisfying the *Clark* rubric.

A.   *How many weapons were ultimately used?*

Appellant's brother, the actual shooter, had a weapon. Appellant was unarmed that night. The evidence does not

3

establish that appellant supplied the gun, which weighs against finding reckless indifference to human life.  (See, e.g., *In re Moore* (2021) 68 Cal.App.5th 434, 452 [although defendant knew that accomplice had a gun, defendant did not supply it and did not use one].)  There is no evidence appellant knew his brother was armed, or knew his brother intended to use a gun during the robbery.  But even assuming appellant knew in advance that his brother was armed, under *Clark* that knowledge alone is insufficient to establish reckless indifference to human life.  (*Clark, supra*, 63 Cal.4th at p. 618; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 988 *(Ramirez)*; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 [use of gun to threaten and keep victims at bay actively enabled the murder, exhibiting reckless indifference].)

> B.  *Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime? What was the duration of the interaction between the perpetrators of the felony and the victims?*

The record shows appellant was playing pool with his brother who decided to commit a robbery and asked appellant if he wanted to go along with it.  Appellant agreed because they were getting high together and needed more money for more drugs.  They looked out the window and saw a fast food restaurant across the street with a car in the drive-thru line.  They were known at the restaurant as they frequented it.  They walked across the street.  Appellant and a third recruit were to and did act as lookouts while appellant's brother approached the victim in the drive-thru line to rob him.  Appellant was some unknown distance from the victim as his brother approached the car.  He did not see the shooting; he heard the gunshot and

4

looked over to see the victim driving the car away from the restaurant. They heard the car crash. The three confederates followed the car to the crash site. That appellant did not see the shooting ("[W]e was just standing by, watching out. So about a couple of minutes went blowing by and we heard gunshots and [the victim] pulled out of the drive—the drive-thru and made a left, he made a hard right and crashed into the back of a church.") is consistent with acting as a lookout, focused on others who might interfere with the robbery rather than participating in the act of robbery itself.

Assuming this scenario constitutes sufficient presence at the scene, presence nonetheless does not mandate a conclusion that the defendant acted with reckless indifference. (See, e.g., *Ramirez, supra,* 71 Cal.App.5th at p. 989 [defendant who was present when accomplice shot victim did not act with reckless indifference].) The question is: what was the effect of his presence at the scene. The limited facts here are three men set out from a bar to commit a robbery. A third man and appellant were lookouts while appellant's brother approached the victim in a drive-thru line. Something occurred between the two men and appellant's brother fired his gun. Appellant was some distance away. It is unclear how much time passed during these events, but according to the evidence considered by the trial court, it is clear appellant was not with his brother and the victim at the car. He was standing some distance away, not observing events unfold since he heard, but did not see the shooting. The shooting appeared to be a spontaneous reaction to victim resistance as opposed to a planned part of the robbery. Given the apparent spontaneity of the shooting and the fact that appellant did not witness it, it appears appellant was not in a position to restrain

his brother, restrain the victim, or to otherwise intervene in how his brother carried out the robbery itself. (See, e.g., *In re Scoggins, supra*, 9 Cal.5th at p. 679 [quickness of shooting suggested defendant lacked control over accomplice's actions]; *In re Moore, supra*, 68 Cal.App.5th at p. 452, [defendant was present during robbery but not close enough to restrain shooter]; compare *Ramirez,* at p. 989 [defendant lacked meaningful and realistic opportunity to intervene when he and shooter were on opposite sides of victim's vehicle and attempted carjacking was quickly executed], with *In re Loza* (2017) 10 Cal.App.5th 38, 51–53 [defendant who was in store where killing occurred had time to observe and react before murder because he heard killer threaten to shoot clerk and count to five before doing so] and *In re Harper* (2022) 76 Cal.App.5th 450, 455, 457 [defendant heard pounding and yelling coming from victim's and accomplice's location and did nothing to intervene, after previously telling accomplice she could do whatever she wanted as long as he was not involved].)

C.    *Did appellant have the opportunity to aid the victim?*

Appellant did not aid the victim. Appellant testified that after the victim's car crashed, the three men ran over to the car and appellant's brother began to rifle through the victim's clothing looking for a wallet. He handed his gun to appellant who held it (not pointing it) while his brother searched the victim whom they believed to be dead. When the wallet was found, the three men left the scene and split up the money.

Not offering aid to a victim elevates money over human life. A defendant's failure to aid a wounded victim shows reckless indifference. (*Clark, supra,* 63 Cal.4th at p. 619; *In re Parrish* (2020) 58 Cal.App.5th 539, 544 [reckless indifference shown by failure to pause to aid or comfort victim]; *People v. Douglas* (2020)

6

56 Cal.App.5th 1, 10 [defendant displayed no interest in moderating violence or in aiding his bloody and suffering victim and instead picked his pocket].) However, when different inferences may be drawn from the circumstances, a defendant's actions after a shooting may not be probative of his mental state. (*In re Scoggins, supra*, 9 Cal.5th at p. 679.)

Additionally, even if appellant was callous in holding the gun while his brother rifled through the victim's clothing, *Clark* demands a showing that appellant knowingly created a serious risk of death; that is, appellant's behavior after the victim was shot, standing alone, is insufficient to show he acted with reckless indifference to human life while participating in the robbery. (See, e.g., *In re Taylor* (2018) 34 Cal.App.5th 543, 560.) Even evidence that a defendant failed to aid the victim and laughed with his accomplices soon after the shooting may be insufficient to support a finding of reckless indifference to human life, especially where the defendant was 16 years old. (*In re Moore, supra,* 68 Cal.App.5th at p. 453.)

Here the undisputed evidence is that when asked what he did to aid the victim, appellant said he did nothing because he assumed the victim was dead. The People did not offer admissible contrary evidence. In fact, the prosecutor present at the parole board hearing stated he thought appellant was "being very sincere with this Board—concerning his efforts to move forward." We have an 18-year-old who made an assumption and acted accordingly. Failure to aid on this evidence, at worst, is subject to different inferences. I cannot find that this after-the-fact-of-the shooting conduct is enough to establish the requisite mental state for the crime, especially when combined with appellant's youth.

7

D.      *What efforts did the defendant make to minimize the risks of violence during the felony?*

There is no evidence one way or another about whether appellant minimized the risks inherent in the robbery.  That one patron of the restaurant was targeted outside the building in a drive-thru line instead of a targeted invasion of the restaurant itself arguably is minimization, but whether that was in the mind of appellant at the time is speculation.  This factor is neutral.

E.      *What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?*

Appellant and the shooter were brothers who belonged to the same gang.  There is no evidence about their respective roles in the gang.  Appellant said he committed robberies and an arson (was present when others set a fire in the bed of a truck in an empty parking).  His rap sheet includes juvenile adjudications for grand theft auto, taking a vehicle without the owner's consent, and one conviction for misdemeanor robbery.  Although he started to carry a gun at age 18 for protection, he never used it as it was confiscated soon after he got it.  He said he never pulled a trigger in his life.  There is no evidence he and his brother had committed violent crimes together before this night.  As gang membership alone does not demonstrate a propensity to commit lethal violence, I find this a neutral factor.  (See *Banks, supra,* 61 Cal.4th at pp. 810–811; *In re Miller* (2017) 14 Cal.App.5th 960, 976 [although defendant and killer belonged to same gang and had committed follow-home robberies together, no evidence indicated they had ever participated in shootings, murder, or attempted murder].)

8

F.  *Age*

Appellant was 18 years old when he agreed to participate in the robbery with his older brother.  The United States Supreme Court has observed that the common byproducts of youth are immaturity, impetuosity, and the failure to appreciate risks and consequences, making it more likely that juveniles fail to appreciate the risks and consequences of their actions.  They are more susceptible to peer pressure as well.  (*Miller v. Alabama* (2012) 567 U.S. 460, 471.)  Although not a juvenile in the legal sense of the word, appellant was as young as an "adult" can be and age is an appropriate factor to consider along with the other *Clark* factors.  (*In re Harper, supra*, 76 Cal.App.5th at p. 470; *Ramirez, supra*, 71 Cal.App.5th at p. 991; *People v. Harris* (2021) 60 Cal.App.5th 939, 960, review granted on another ground, Apr. 28, 2021, S267802.)

Here the record shows appellant's older brother suggested the robbery to which appellant agreed.  Appellant was homeless on the night of the crime and was staying with his older brother.  The record also reflects appellant was raised in foster homes after his PCP-addicted mother was taken to a psychiatric facility.  His mother physically beat him and his father, who owned a business, left and started another family with another woman.  Appellant recalled stealing a roasted chicken when he was 10 years old because he was hungry.  He was jumped into his older brother's gang at age 15.  He viewed his brother as the family member who cared about him, helped him deal with their mother's addiction, and gave him a place to stay when he was homeless.  Indeed, he joined the gang because of his brother.  Appellant's age under these circumstances weighs against a finding that he harbored reckless indifference to human life.

9

At the parole board hearing, appellant told the commissioners that as he sat in jail after his arrest, he reflected on the shooting and "knew something like this was going to happen because I was on the path of destruction." To use that statement to infer that the 18-year-old appellant appreciated the full ramifications of his acts at the time of the robbery is a far and unfair stretch.

Considering the totality of the *Clark* factors, I cannot find the evidence sufficient to support the trial court's finding of reckless indifference. All we know is an unarmed 18-year-old appellant agreed to participate in a robbery with his older brother as a lookout. The shooting appeared spontaneous; appellant only heard the shots and did not see the shooting. He was unable to intervene in the rapidly unfolding events. Assuming he stood lookout again when his brother searched the victim's clothing for money, he also assumed the victim had already died when they came upon him in his crashed car. Under *Clark*, I cannot say appellant's actions before and after the shooting and car crash are sufficient to establish the mental state of reckless indifference to human life. I would reverse the denial of the Penal Code[3] former section 1170.95[4] petition and direct the trial court to vacate the murder conviction and resentence appellant as called for by the statute.

---

[3]     Undesignated statutory references are to the Penal Code.

[4]     Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10).

II.    Appellant's Parole Board Testimony

The only evidence the People used to prove "reckless indifference" were appellant's own words when he answered the parole board's necessarily circumscribed questions about the offense (for the commissioners told appellant "Nothing that happens here today is going to change the court findings as we're not here to retry your case."). Although I conclude the statements were insufficient to support the finding, I also conclude they never should have been used in the first place. Here, appellant was an unwitting witness against himself for, of course, he had no inkling he would later be entitled to a hearing where his conviction and sentence could be vacated under former section 1170.95, subd. (d).

I find appellant's statements at the parole hearing inadmissible under the judicially devised exclusionary remedy of *Coleman*. *Coleman* held the People cannot use testimony given by a defendant at a probation revocation hearing against the defendant at a trial for the same underlying conduct. The *Coleman* Court found it fundamentally unfair to compel a defendant to choose between his right against self-incrimination at trial and his right to present mitigating evidence by way of testimony at a revocation hearing. *Coleman* sought to avoid the " 'cruel trilemma' of self-accusation, perjury or injurious silence." (*Coleman*, *supra*, 13 Cal.3d at p. 878.)

Here appellant has the right to present evidence at his parole board hearing or suffer possibly injurious silence. (§ 3041.5, subd. (a)(2).) Indeed, California encourages inmates to participate fully in parole hearings so that parole commissioners can make a fully informed decision about suitability for parole. (*In re Shaputis* (2011) 53 Cal.4th 192, 218 [an inmate's insight

11

into and remorse for the crime are critical factors in determining suitability for parole].)

On the other hand, appellant also has legislatively granted rights that govern former section 1170.95 evidentiary hearings to determine whether a conviction can be sustained after elimination of the former felony murder rule and natural and probable cause doctrine as theories of liability. The Legislature has decreed the rules of evidence apply, the right to counsel attaches, the People bear the burden of proof, and that proof must be beyond a reasonable doubt. Our Supreme Court has similarly interpreted the legislation to accord these rights. (*People v. Gentile* (2020) 10 Cal.5th 830; *People v. Lewis* (2021) 11 Cal.5th 952.) The evidentiary hearing, then, is analogous in many respects to a bench retrial conducted on the record of the initial trial or plea and on additional admissible evidence each party may proffer. What appellant got, however, was a hearing based solely on self-accusation.

In passing Senate Bill No. 1437, the Legislature extended substantial constitutional rights by statute to eligible convicted felons and set up an elaborate mechanism by which eligibility is to be determined and convictions are to be re-proven, or, if not re-proven, resentencing is to occur. It then later amended the statute by enacting Senate Bill No. 775 (2021–2022 Reg. Sess.) to clarify the unconditional nature of those rights. (Stats. 2021, ch. 551, § 2.) These statutes are not indicative of the Legislature's simple intent to bestow lenity upon convicted defendants. The Legislature did not just change a monetary threshold separating misdemeanors and felonies, reduce sentencing maximums for particular types of crimes, make the imposition of mandatory enhancements discretionary, or eliminate sentencing options

12

altogether.  It effected a huge sea change in the way the taking or attempted taking of a life is now prosecuted in California.  And in fashioning a remedy that retries eligible defendants with the protections of the right to counsel, the right to proof beyond a reasonable doubt, the right to be confronted only with evidence admissible under the Evidence Code, and the right to stand pat and insist that the People bear the burden of proof, the Legislature did not just offer reclassification of a conviction.  Eligible convictions are not reclassified, but they are retried with the option of new evidence presented by either party.  As was discussed, for example, in *People v. Williams* (2020) 57 Cal.App.5th 652, in the initial version of Senate Bill No. 1437, the Legislature gave the courts "unfettered discretion" in determining what evidence to receive in ruling on a petition under former section 1170.95.  (*Id.* at p. 661.)  In the amendments set forth in Senate Bill No. 775, the Legislature expressly stated its intent that the Evidence Code govern the conduct of proceedings.  (Former § 1170.95, subd. (d)(3).)

This framework is indicative of the Legislature's intent that these evidentiary hearings be treated with the same solemnity and under the same rules as was the initial trial (albeit without a jury).  Given the panoply of rights our Legislature has granted convicted defendants who file petitions under former section 1170.95, I would include in those rights the right against self-incrimination, for it goes hand-in-hand with imposing the burden of proof on the prosecution.  (*Coleman, supra*, 13 Cal.3d at p. 876 ["The heavy burden thus placed upon the prosecution in a criminal trial to prove through its own investigation the guilt of the defendant may be substantially lightened if the prosecution is allowed to take advantage of the defendant's testimony at a prior

13

probation revocation hearing."])  I surmise the People may have believed this as well because they did not call him to testify at the hearing, using the transcript of his statements instead.

The use of parole board statements as proof against a defendant at a former section 1170.95 evidentiary hearing unquestionably lessens the People's burden of proof.  This lessening is incompatible with the Legislature's express imposition of that burden on the People unvarnished by any qualifications, exceptions, or conditions.  Moreover, we have seen how the Legislature acted quickly to amend Senate Bill No. 1437 to clarify its intent when courts limited or constricted provisions of the bill.

More to the point, use of appellant's statements is fundamentally unfair, the only rationale upon which *Coleman* is premised.  The point of *Coleman* was to ensure that rights which attach to different types of proceedings do not collide with each other when they are exercised.  To those who say, "Well, no one forced appellant to make a statement to the parole commissioners," I respond, "No one forced Coleman to make a statement at his probation revocation hearing."  Just as no one forced the defendant in *Simmons v. United States* (1968) 390 U.S. 377 to file a suppression motion, yet the court held that his testimony at the suppression hearing could not be used against him at trial.  Just as no one forced the defendant in *People v. Knight* (2015) 239 Cal.App.4th 1 to file a *Marsden* motion, yet the court held that permitting the People access to defendant's statements would impermissibly lighten their burden of proof at trial.  (See also *People v. Dennis* (1986) 177 Cal.App.3d 863 [use immunity applies to disclosures made in motion for new trial on grounds of ineffective assistance because disclosures

14

could conceivably lighten the People's burden of proof, implicating defendant's right against self-incrimination].) Similarly, our Court in *Coleman* held the permitting defendants to fully exercise two competing rights without prejudice to either one is important enough to warrant a judicially devised remedy for what would otherwise be unfair.

Put another way, there is no right if its exercise comes with a price tag. Here appellant had a right to present mitigating albeit incriminating evidence at the parole hearing and he had a right against self-incrimination at an evidentiary hearing under former section 1170.95. The exercise of those rights should not collide.

I conclude Senate Bill No. 1437 and former section 1170.95 are more than just acts of lenity. They created evidentiary and procedural rights and obligations that must not be abrogated. The only way to remain true to the Legislature's intent to carry over, without prejudice, fundamental trial rights to evidentiary hearings under former section 1170.95, subdivision (d) is to apply *Coleman's* judicially created remedy and exclude the parole board testimony.

I find the trial court erroneously admitted the appellant's parole board testimony. The error is not harmless. (*People v. Watson* (1956) 46 Cal.2d 818 [error is not harmless if it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error].) Here appellant's testimony was the only evidence considered by the trial court in determining that appellant acted with reckless disregard of human life. It is reasonably probable the result

15

would have been more favorable to him without this evidence. The trial court's order should be reversed.


STRATTON, P. J.